Missouri Pacific Railroad Company *v.* Ault.

Opinion delivered November 17, 1919.

1. Master and servant — agreement as to work on Sunday — breach of employment.—A contract of employment between appellant and appellee required the latter to work on Sundays. *Held,* where the parties agreed that appellee might substitute another in his place on Sunday, appellant can not contend that appellee's failure to work in person on Sundays operated as a breach of the contract.

2. Master and servant—discharge of servant.—Appellee was employed by appellant, as freight trucker at twenty-five cents an hour. Appellant then refused to continue that employment and offered appellee work as porter or baggageman at a salary of $45 a month. *Held,* appellant's action was tantamount to a discharge from and a refusal to further employ appellee in his original position within section 1, act 210 of 1905.

3. Railroads—promise to pay discharged employee.—When the foreman of a discharged railway employee, told the latter that he would be paid his money at a certain place, where a regular agent was kept, it is equivalent to a request by the employee, to be paid at that place, and is sufficient to entitle him to recover the statutory penalty for failure to send the money.

4. RAILROADS—GOVERNMENT CONTROL—RIGHT TO SUE AND BE SUED.— The meaning of the act of Congress of March 21, 1918, authorizing the taking over of certain railroads by the Government, is that so far as suing and being sued is concerned, railroads occupied the same status after being taken over by the Government as before.

5. SAME—SAME—DIRECTOR GENERAL.—The Director General of Railroads under Federal control was not in the position of a receiver of the said road. This attitude was that of an agent for the Government, taking over the railroads as a necessity of war, under congressional and presidential authority.

6. SAME — SAME — SAME — ENFORCEMENT OF JUDGMENT AGAINST THE PROPERTY OF THE RAILWAY COMPANY.—A judgment may be enforced against a railroad company, while in the hands of the Director General under Federal control.

7. SAME—SAME—SAME—SAME—CONSTITUTIONALITY OF FEDERAL ACT. —The act of Congress of March 21, 1918, taking over the railroads *held* constitutional.

Appeal from Hot Spring Circuit Court; *J. C. Ross,* Judge; affirmed.

*E. B. Kinsworthy* and *W. R. Donham,* for appellant.

1. Appellee was not discharged; he quit of his own accord. A reduction of wages under the proof was not a discharge. 208 S. W. 790.

2. Appellee made no demand as required by statute that his money or a valid check be sent to a station where a regular agent was kept and was not entitled to any penalty. 128 Ark. 312; 87 Ark. 132; 88 *Id.* 277.

The cause of action should have been dismissed as to the railroad company. 254 Fed. 880.

*D. D. Glover* and *Jabez M. Smith,* for appellee.

Appellee was discharged without cause and was entitled to his pay and the penalty awarded. 131 Ark. 379. The court correctly declared the law, and the evidence sustains the judgment, and the judgment should be affirmed for the wages and penalty, and there is no error.

HUMPHREYS, J. Appellee brought suit against the Missouri Pacific Railroad Company, before D. M.

Noble, a justice of the peace in Fenter township, Hot Spring County, Arkansas, to recover the sum of $50 as wages, and a penalty prescribed by Act 210 of the Acts of the Legislature of 1905, amending section 6649 of Kirby's Digest. The act, insofar as it relates to this case, is as follows: "Whenever any railroad company or corporation or any receiver operating any railroad engaged in the business of operating or constructing any railroad or railroad bridge, shall discharge with or without cause or refuse to further employ any servant or employees thereof, the unpaid wages of any such servant or employee then earned at the contract rate, without abatement or deduction, shall be and become due and payable on the day of such discharge or refusal to longer employ, any such servant or employee may request of his foreman or the keeper of his time to have the money due him, or a valid check therefor, sent to any station where a regular agent is kept, and if the money aforesaid, or a valid check therefor, does not reach such station within seven days from the date it is so requested, then as a penalty for such nonpayment the wages of such servant or employee shall continue from the date of the discharge or refusal to further employ at the same rate until paid."

Default judgment was rendered in favor of appellee in the magistrate's court for $50 and $2.50 per day as a penalty for nonpayment of the wages from July 9, 1918, until the payment of said sum. An appeal was taken from that judgment to the circuit court in said county, and, on the 20th day of January, 1919, the Missouri Pacific Railroad Company filed an answer, denying the indebtedness or liability for a penalty, the discharge or refusal to continue appellee in its employment, any request or demand by appellee on his foreman or time keeper to send the amount claimed to be due him as wages, or a valid check therefor within seven days to the agent at Malvern, or that appellee applied to said agent, after seven days, for his wages, or a valid check therefor.

On the 29th day of January following, appellee filed a motion to substitute in his place, as defendant, Walker D,

Hines, Director General of Railroads. Over the objection of appellant, the court refused to make the substitution, but made the Director General a party defendant. The cause then proceeded to trial and was submitted to a jury upon the pleadings, evidence and instructions of the court. The jury returned the following verdict: "We, the jury, find for the plaintiff in the sum of $50 as debt for labor; also $2.50 per day as penalty from the 28th day of July, 1918, until the present date. J. M. Caldwell, Foreman." Thereupon, a judgment was rendered against appellants for $50 debt, and $390 penalty. From that judgment an appeal has been duly prosecuted to this court.

(1) Appellants first insist that the undisputed evidence showed that appellee voluntarily quit the service of appellants and that it was error to render judgment against them for a statutory penalty on the theory of a discharge or refusal to further employ appellee. It is said that because the contract required appellee to work on Sunday, his failure to work in person on the Sabbath day amounted to a breach of his contract. The evidence tended to show that appellee and his employer had agreed that he might substitute, at his own expense, some one else to work on the Sabbath day. Under such an arrangement, a failure to report in person and work on the Sabbath day would not constitute a voluntary cessation of appellee's duties under the contract. It was a question for the jury to say whether or not such an arrangement was made under the contract of employment.

(2) Again, it is said that, because appellee refused to accept employment as a porter or baggage man at $45 per month, therefore he voluntarily quit the service of said railroad company. The evidence disclosed that in the month of July, 1918, appellee was employed by W. W. Jones, station agent at Malvern as a freight trucker at the rate of twenty-five cents an hour, or $2.50 a day for a ten-hour day; that after about ten days, W. W. Jones entered the army and was succeeded by E. B. Williams; that, on or about the 27th day of July, appellee received

information that Williams had placed him on the roll as porter, or baggageman, at a salary of $45 a month, and intended to pay him only $1.50 per day for the entire time he had worked; that he went to see Williams, who turned to the record, under the heading "porter," and told appellee he could not allow him more than $45 a month, and that it was up to him to accept or refuse that money; that appellee contended he had not been working as porter and could not support his family on that amount; that Williams responded he could not allow more, whereupon appellee informed him that he might have the job as soon as he paid him off; that the agent sent a man to take his place, but appellee refused to let the new man go to work until he received his pay.

The appellee then consulted an old employee, who advised him that he could not keep the new man from going to work; that on the next day, Sunday, his substitute was displaced by the new man. We think the refusal of appellants to allow appellee to work longer in the capacity of freight trucker, at 25 cents an hour, and their offer to retain him as porter or baggageman, at a salary of $45 per month, was tantamount to a discharge from and a refusal to further employ appellee in his original position, within the meaning of section 1, act 210, of the Acts of the Legislature of 1905. Under this construction of said act, as applied to the facts in this case, it can not be said that appellee voluntarily quit the service of appellants.

(3) It is next insisted that appellee was not entitled to a penalty because the undisputed evidence showed that he did not bring himself within that provision of said act which required the employee, when discharged or when refused employment, to request his foreman or keeper of his time to send the money due him, or a valid check therefor, to a station agent, at a station where a regular agent is kept. Appellee testified that, after he made up his mind not to prevent the new man from taking his place, he demanded the wages due him from E. B. Williams, his immediate employer, and the man who kept

his time; that Williams responded that the money would be here in seven days. The undisputed evidence also showed that this conversation occurred in the Malvern depot, where appellee had been working and where E. B. Williams was employed as the regular station agent. This court held, in the case of *Biggs* v. *St. Louis, I. M. & S. R. Co.*, 91 Ark. 122 (quoting the sixth syllabus) that:

"Where, at the time a servant was discharged by a railroad company, his foreman notified him that his money would be sent to a station named where a regular agent was kept, to which the servant acquiesced, this was equivalent to a request by the servant to have the money due him sent to the station, and sufficient to entitle him to recover the statutory penalty for failure to send the money."

We think the evidence in this case brings it clearly within the rule laid down in *Biggs* v. *St. Louis, I. M. & S. R. Co., supra.*

Lastly, appellant insists that it was erroneous to render any judgment against the Missouri Pacific Railroad Company, for the reason that the undisputed evidence showed that at the time of the employment and discharge of appellee the railroad was being operated by Walker D. Hines, Director General of Railroads in the United States of America, and not by said railroad company. Under authority granted by Congress on August 29, 1916, the President issued a proclamation on December 26, 1917, for the Director General to take possession of certain railroads in the United States, including the Missouri Pacific Railroad Company. On March 21, 1918, thereafter, Congress passed a statute to the effect that, "Carriers while under Federal control shall be subject to all laws and liabilities as common carriers, whether arising under State or Federal laws or at common law, except insofar as may be inconsistent with the provisions of this act or any other act applicable to such Federal control or with any order of the President. Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by

law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the Federal Government.''

(4-5)  If the word ''carriers'' used in this act had reference to the Director General, who was operating said railroad, then it was improper to render a judgment against the Missouri Pacific Railroad Company.  We are unable to find anything in the language or context used that indicates that the word ''carriers'' refers to the Director General.  On the contrary, the plain meaning is that, so far as suing and being sued is concerned, the railroad occupied exactly the same status after being taken over by the Government as before.  The case of *Rutherford* v. *Union Pacific Rd. Co.*, 254 Fed. 880, cited by appellant in support of its position that the statute in question had reference to the Director General, and not to the original corporation, argued that the Director General occupied the same position with reference to the railroad as receivers do.  We do not think the position occupied by the Director General is analogous to that of a receiver.  The attitude of a receiver is that of a trustee for the benefit of creditors.  The attitude of the Director General is that of an agent of the Government taking over the railroads as a necessity of war, under congressional and presidential authority.  A receivership implies insolvency; the operation of the railroad under a director general does not carry such an implication. We think the later case of *Jensen* v. *Lehigh Valley Rd.*, 255 Fed. 795, is the better reasoned case.  It was said by Judge Hand in the latter case: ''It appears to me that Congress pretty clearly meant, by the term 'carriers,' the corporations themselves, and that the right to sue them must remain certainly till it is changed by some valid provision.''

(6-7)  It may be contended that the statute in question is unconstitutional, because, if the claim is reduced to a judgment and enforced against the property of the corporation, it would amount to a taking of private property

without due process of law from the corporation to pay a liability incurred by the act of the Federal authorities operating the road. We do not understand that such would be the effect of the act. Immunity from loss, as well as assurance of a reasonable return upon the investment, was guaranteed the -railroad corporations by the government. Act March 21, 1918, c. 25, 40 Stat. 451. Under such a guarantee the enforcement of judgments against the property of the railroad corporations during the control by Federal authorities could not have the effect of confiscating their property. Immunity from loss and assurance of gain are a complete answer to any contention that the enforcement of such judgments would be the taking of private property without the process of law, or the taking of private property for public purposes without just compensation. We think the act constitutional.

No error appearing in the record, the judgment is affirmed.