# Wytheville

## WALTER D. HINES, DIRECTOR GENERAL OF RAILROADS, OPERATING THE CHESAPEAKE AND OHIO RAILROAD, v. W. F. GRAVINS.

### June 15, 1922.

### Reheard June 4, 1923.

1. LIBEL AND SLANDER—*Commom Law—Imputation of Dishonesty.*—A charge by an agent of a carrier that a merchant sent a man who stole certain eggs from the car of the carrier consigned to the merchant, and had him bring the eggs to the merchant's store, and that the merchant afterward made claim for the eggs against the carrier, constituted slander at common law.

2. LIBEL AND SLANDER—*Common Law—Necessity of Publication.*—In order to sustain a recovery for slander at common law, it is necessary to allege and prove that there was a publication.

3. LIBEL AND SLANDER—*Publication—Allegation in Declaration—Bill of Particulars.*—A declaration alleged that the slander was published, but did not follow the usual form and allege that the slander was published in the presence and hearing of, or to any other person than the plaintiff.

   *Held:* That, while it was true that the defendant was ultimately entitled to know to whom the slander was published, that he could have secured this information by a motion to require the plaintiff to file the particulars of his claim.

4. LIBEL AND SLANDER—*Virginia Statute Against Insulting Words—Necessity of Publication.*—Under the Virginia statute (section 5781, Code of 1919) against insulting words, publication is not necessary in order to entitle a plaintiff to recover for insulting words.

5. LIBEL AND SLANDER—*Virginia Statute Against Insulting Words—Purpose of the Act.*—The purpose of the Virginia act against insulting words (Code of 1919, section 5781) was to so extend the common law as to give a right of action for insulting words, even though containing no imputation which was actionable at common law. The design of the statute is to prevent breaches of the peace, to discourage offensive and excessive freedom in the use of that unruly member, the tongue,

to inflict punishment therefor, and by subjecting those who are so hasty of temper and inconsiderate of the feelings of others as to insult them to such actual and punitive damages as may be awarded by a jury.

6. LIBEL AND SLANDER—*Agency—Agent Acting within Scope of His Authority.*—Where an agent is acting within the scope, or within the apparent scope, of his authority, his principal is liable under the doctrine of *respondeat superior* for slander by the agent.

7. LIBEL AND SLANDER—*Agency—Agent Acting within Scope of His Authority—Officers and Agents of Private Corporations.*—While there are cases of high authority which distinguish between the liability of a corporaticn for libel and for slander, holding that a verbal defamation is so personal that a corporation is only liable for a slander uttered by its agent where it has actually authorized, or subsequently ratified, his utterance, the whole trend of judicial opinion in the more modern cases is to disregard such a distinction as unsound and based upon no sufficient reason.

8. LIBEL AND SLANDER—*Agency—Agent Acting within Scope of His Authority—Officers and Agents of Private Corporations—Agent of Carrier—Case at Bar.*—An agent of a carrier who was not charged with the duty of personally issuing bad order or shortage tickets, which were issued by one of his immediate subordinates and signed by him, was acting within the actual and apparent scope of his authority in making a charge of fraud against a claimant of shortage in delivery.

9. RAILROADS—*Director General—Liability of Director General—Libel and Slander.*—It was the intention of the act of Congress (section 10 of the Federal control act, Comp. St. Ann. Supp. 1919, section 3115¾-j), which was effectuated by the proclamation of the President, through the director general, based upon the act of Congress; to preserve to the public substantially every right of action against the director general for compensatory damages which theretofore existed against railroad corporations; e. g., an action of slander.

10. RAILROADS—*Director General—Liability of Director General—Exemplary Damages—Statutory Penalties.*—All State laws which theretofore justified the imposition of penalties were abrogated during the period of Federal control of railroads, and in no event could punitive damages be imposed upon the Director General.

11. EXEMPLARY DAMAGES—*Purpose of Exemplary Damages.*—Punishment. of the offender as a deterrent example to others is the sole justification for awards of punitive or exemplary damages.

12. RAILROADS—*Director General—Liability of Director General—Virginia Statute Against Insulting Words.*—The Federal control act (Comp. St. Ann. Supp. 1919, section 3115¾-j) prevents and supersedes the operation of State statutes imposing penalties, and exemplary damages imposed under the Virginia statute for insulting words cannot

be distinguished from other pecuniary exactions imposed as punishment under other statutes.

13. EXEMPLARY DAMAGES—*Agency—General Rule.*—The general rule is that punitive damages cannot be recovered against a principal for a slander uttered by one of its agents, unless he has either authorized and directed the utterance by the agent, or after knowledge thereof has ratified and approved it.

14. EXEMPLARY DAMAGES—*Agency—Action Against Director General of Railroads.*—In an action for damages for insulting words under the Virginia act (section 5781, Code of 1919) against the Director General of Railroads, there being no evidence that the Federal agent or the Director General ever at any time authorized, ratified, or approved the offensive charge made by a carrier's agent, instructions authorizing the recovery of punitive damages were erroneous.

15. EXEMPLARY DAMAGES—*Agency—Action Against Director General of Railroads.—Ratification—*Where in an action against the Director General of Railroads for insulting words, the Director General does not plead justification, but only tendered the general issue of not guilty, his action does not afford the slightest evidence of ratification of the action of the carrier's agent in making the charge complained of.

16. APPEAL AND ERROR—*Judgment by Appellate Court—Action for Insulting Words Against Director General of Railroads.*—In an action for insulting words against the Director General of Railroads, no actual damages were proved, and the only damages which could be recovered were punitive damages, and this only because of the Virginia statute (section 5781, Code of 1919).

*Held:* That plaintiff had failed in his proof to show that he was entitled to any damages, as punitive damages could not be recovered against the Director General, and that final judgment would be entered in favor of the Director General in accordance with section 6365 of the Code of 1919.

ON REHEARING.

17. EXEMPLARY DAMAGES—*Virginia Act Against Insulting Words—Corporations—Director General.*—In the former opinion it was held that punitive damages could not be recovered against the Director General. On rehearing the Supreme Court of Appeals adhered to that conclusion for the reasons stated in that opinion, and also because punitive damages cannot be awarded against a corporation for the act of its servant, unless such act was previously authorized or subsequently ratified by the corporation, whether the question be one of Federal or State law.

18. LIBEL AND SLANDER—*Virginia Act Against Insulting Words—Liability of Principal for Insulting Words Uttered by His Agent—Compensatory*

*Damages—Director General.—Assuming*, for the purposes of this case, that a principal is liable for compensatory damages under the Virginia statute against insulting words (section 5781 of the Code of 1919) for insulting words uttered by his agent in the course of his. employment, when such words are neither authorized nor ratified. by the principal, there is a difference in this respect between the Director General of Railroads and other employers, and an action. for compensatory damages in such case cannot be maintained against. the Director General.

19.  RAILROADS—*Government Control—Actions and Suits Against the Government.*—When the Federal government took possession and control of all the railroads of the country, it had the power to forbid any actions or suits against it growing out of their operation, or, if it permitted such actions or suits, to prescribe in what courts, for what. causes of action, within what time, and upon what terms and conditions, it would permit itself to be sued. It chose the latter course, and gave expression to its will in what is designated as the Federal control act, 40 Stat. 451 (Comp. Stat. 1918, sec. 3115¾-j).

20.  RAILROADS—*Government Control—Actions and Suits Against the Government—Action for Injury to Feelings or Reputation.*—General Order No. 50a, promulgated by the President through the Director General, forbade any recovery of "fines, penalties and forfeitures," and also limited the causes of action for which actions or suits might be brought to those based on contracts, binding upon the Director General of Railroads, claims for death, claim for injury to persons, and claims for loss or damage to property.

*Held:* That the order was valid and that the words "claims for death or injury to person" showed plainly that the injury to person referred to was a physical injury and not an injury to the feelings or reputation, such as mental anguish caused by a private insult.

Error to a judgment of the Hustings Court, Part Two, of the city of Richmond in an action of trespass. on the case. Judgment for plaintiff. Defendant assigns. error.

*Reversed.*

The opinion states the case.

*D. H. & Walter Leake* and *Sherlock Bronson*, for the plaintiff in error.

*Bethel & Williams, M. J. Fulton* and *John J. Wicker,. Jr.*, for the defendant in error.

PRENTIS, J., delivered the opinion of the court.

This is an action for slander and insulting words under the Virginia statute, in which there was a verdict and judgment against the Director General of Railroads in favor of W. F. Gravins.

The case must be considered in two aspects, because it is necessary to observe the distinction between common law action for slander and the action given in Virginia by statute for insulting words.

1. The first count of the declaration charged common law slander. Omitting the introductory statements, this count charged that the defendant, "maliciously, wickedly and falsely uttered and published of and concerning the said plaintiff, and of and concerning him in his trade and business, the following scandalous and malicious and defamatory words, that is to say, the said defendant, by and through the said G. A. Warthen, his general agent, servant and employee, acting within the general or apparent scope of said Warthen's employment and in the furtherance of defendant's business, or incidental thereof, or within the actual or apparent scope of said Warthen's employment, or authorized expressly or impliedly or approved or ratified expressly or impliedly by said defendant, did say: 'I' (meaning him, G. A. Warthen, general agent, agent, servant and employee of said defendant) 'am not thoroughly convinced that you (meaning W. F. Gravins) 'did not send the man' (meaning the man who stole the eggs) 'to the car' (meaning the railroad car of defendant) 'to get the eggs' (meaning the eggs stolen from the car), 'and the man' (meaning the man who stole the eggs) 'bring them to your store,' (meaning the store of W. F. Gravins) 'and you' (meaning W. F. Gravins) 'filed claim for them.' Meaning that W. F. Gravins, the plaintiff, was a crooked and dishonest

person, and that he, W. F. Gravins, sent the man who stole the eggs from the car, and had him bring the eggs to his store, and that he, Gravins, made claim for the same against defendant."

There was a demurrer to this count as well as to the other two and to the entire declaration, which was overruled by the court.

Referring now alone to this count, we think it only necessary to consider one of the grounds alleged in the demurrer, and that is that the count is fatally defective because it fails to allege a publication of the alleged slander.

[1-3] We think it needs no citation of authority to show that the words charged, with the inducement, colloquium, imputation and innuendoes, constitute common law slander. It is necessary, however, also, in order to sustain a recovery for slander at common law, to allege and prove that there was a publication. *Stivers* v. *Allen*, 115 Wash. 136, 196 Pac. 663, 15 A. L. R. 247, 17 R. C. L. 315. Bearing these principles in mind, we observe that the declaration does not follow the usual form and allege that the slander was published in the presence and hearing of, or to any other person than the plaintiff. It does, however, allege a publication. Whether or not this alone is sufficient, it is necessary to determine. *Sun Life Assurance Co.* v. *Bailey*, 101 Va. 445, 44 S. E. 692. It is certainly true that the defendant was ultimately entitled to know to whom the slander was published; but this information he could have secured by a motion to require the plaintiff to file the particulars of his claim. Whether overruled or sustained, however, the demurrer does not dispose of the question in this case, because it was again raised after the evidence was introduced and it clearly appears from the plaintiff's own testimony that in the

angry colloquy which occurred between the plaintiff and Warthen, the general agent of the defendant, no one was close enough to them to hear the offensive words.   It clearly appears, therefore, that there was no publication of the alleged slander.

The necessity for showing such publication seems to have been ignored during the trial, because, notwithstanding the indisputable fact that the alleged slanderous words were never spoken or published of the plaintiff to any one other than himself, the court in the admission of the testimony and in the giving and refusing of instructions, appears to have allowed the trial to proceed upon the theory that no publication was necessary.   For this error, which pervades the entire proceedings, the case must be reversed.   The defendant is entitled to a judgment here in his favor upon the count charging the common law slander, and this without reference to any of the other questions which are raised.

[4] 2.   There were, however, two other counts in the declaration under the Virginia statutes (Code, 1919, sec. 5781), which provides that "All words which from their usual construction and common acceptation are construed as insults and tend to violence and breach of the peace shall be actionable.   No demurrer shall preclude a jury from passing thereon."   The briefs contain an elaborate discussion in support of the contention that publication is also required in order to entitle a plaintiff to recover for insulting words, as in common law slander.   It may be conceded that there is much in favor of this view.   We have, recently, however, after careful deliberation, in a previous case, *Davis* v. *Heflin*, 130 Va. 169, 107 S. E. 673, determined otherwise, and believe the conclusion there reached to be sound.   In *Rolland* v. *Batchelder*, 84 Va. 673, 5 S. E. 695, the same view was expressed.

[5] When the history of the statute is recalled, and it is observed that its purpose was so to extend the common law as to give a right of action for insulting words, even though containing no imputation which was actionable at common law, the reason for the rule of *Davis* v. *Heflin,* to which we adhere, seems to us apparent. The design of the statute is to prevent breaches of the peace, to discourage offensive and excessive freedom in the use of that unruly member, the tongue, to inflict punishment therefor, and by subjecting those who are so hasty of temper and inconsiderate of the feelings of others as to insult them to such actual and punitive damages as may be awarded by a jury. The purpose of the statute would be in a measure defeated, and breaches of the peace would be encouraged rather than discouraged, by holding that no action would lie thereunder for insults privately given. The statute is peculiar, as we believe, to Virginia and Mississippi, and while most of the rules applicable to common law slander are now applicable to this action, the rule requiring publication is not applicable. Considered from this point of view alone, we are of opinion that the court did not err in overruling the demurrer to the second and third counts of the declaration.

[6] Warthen, who uttered the words complained of, was not sued, and it must be remembered that there may be some liability upon him which could not be imposed upon the director general, who was sued. If the liability of the director general is identical with that which would have attached to the railway corporation before he took possession, then there is no doubt that, by the great weight of authority, if Warthen was acting within the scope, or within the apparent scope, of his authority, then his principal is liable upon the doctrine of *respondeat superior* to the plaintiff.

[7] While there are cases of high authority which distinguish between the liability of a corporation for libel and for slander, holding that a verbal defamation is so personal that a corporation is only liable for a slander uttered by its agent where it has actually authorized, or subsequently ratified, his utterance, the whole trend ·of judicial opinion in the more modern cases is to disregard such a distinction as unsound and based upon no sufficient reason.

Among those cases is *Rivers* v. *Yazoo & Miss. Val. R. Co.*, 90 Miss. 196, 43 South. 471, 9 L. R. A. (N. S.) 931, in which a corporation is held liable for slander, where it was shown that the agent was acting in the scope of his employment and in the actual performance of the duties of the corporation touching the matter in question; and a plea which set up by way of defense that it did not appear that the corporation had knowledge that the slanderous words had been uttered or published, that they were not uttered with its approval or consent, and that they had never been ratified, was overruled.

So, also, in *Hypes* v. *Southern Ry. Co.*, 82 S. C. 315, 64 S. E. 395, 21 L. R. A. (N. S.) 873, 17 Ann. Cas. 620, the defendant was held responsible for a slander uttered by the division superintendent while examining the time account of an engineer, charging him with stealing from the company, upon the ground that it was in the course and scope of his employment and· under the implied authority of the corporation. *Kane* v. *Boston Mut. L. Ins. Co.*, 200 Mass. 265, 86 N. E. 302; *Empire Cream Separator Co.* v. *De Laval Dairy Supply Co.*, 75 N. J. L. 207, 67 Atl. 711.

In *Roemer* v. *Jacob Schmidt Brewing Co.*, 132 Minn. 399, 157 N. W. 640, L. R. A. 1916 E, 774, it is held that the liability of a corporation for a slander uttered by its agent is governed and determined by the same rule

which determines its liability in the case of libel published by such agent, and it is responsible for a slander uttered by said agent in the course of his employment and in the furtherance of business engaged in by the corporation; and other modern cases are cited in a note to this case, L. R. A. 1916 E, 774. *Grand Union, etc.,* v. *Lord,* 231 Fed. 392, 145 C. C. A. 384, Ann. Cas. 1918 C, 1118. There is a *dictum* to the same effect in *Sun Life Ins. Co.* v. *Bailey,* 101 Va. 446, 44 S. E. 692.

[8] That Warthen was then acting within the actual and apparent scope of his authority is manifest. The plaintiff was in the habit of receiving carload shipments of eggs. He had complained on the 4th of September that apparently twenty-one crates of eggs had been stolen from a car belonging to him, then on the railroad yard to be unloaded. The suspicion of the Director General's agents had also been aroused by the fact that a colored driver had been seen to go to the car and unload some of the eggs, but as they were not sure that this was not one of Mr. Gravins' drivers, they did not stop him. This circumstance was being investigated by King, the chief special agent of the carrier, and the thief was soon thereafter caught and convicted. Gravins then thought that twenty-one cases had been taken, but when the car had been fully unloaded he discovered that only eight cases were missing. He thereupon, on September 5th, went to Warthen's office to obtain what is spoken of as a bad order or shortage ticket for the eight crates of eggs to form the basis of his claim against the defendant for the value of the eggs which had apparently been stolen. Warthen was not charged with the duty of personally issuing these bad order or shortage tickets, but one of his immediate subordinates was, and such tickets were signed in Warthen's name. Warthen's claim in the discussion arising as to the circumstances

related, was that after the car was delivered to the con-signee, his principal ought not to be held responsible for theft therefrom.    Warthen and Gravins met just out-side of the office, when an angry colloquy resulted, though the great weight of testimony shows that Gravins, especially after he alleges that Warthen uttered the offensive words, became excited and violent in manner, that his words were loud and angry, and in the highest degree insulting to Warthen, whereas Warthen was more quiet in manner, and what he said to Gravins was said in a quiet, restrained tone and was heard by no one else except Gravins.

These being the circumstances, there can hardly be any fair doubt that Warthen was acting within the apparent scope of his authority.

[9] We are urged to hold that whatever would be the rule, if Warthen had been acting as the agent of the railroad company, this rule should not be applied to the Director General.  There is some authority for this view, but we believe the weight of authority and the better reason is the other way, and that the statute indicated the intention of the Congress, which was effectuated by the proclamation of the President, through the Director General, based upon the act of Congress, to preserve to the public substantially every right of action against the Director General for compensatory damages which theretofore existed against the corporations.

Section 10 of the Federal control act (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, sec 3115¾-j), among other things provides: "That carriers while under Federal control shall be subject to all laws and liabilities as common carriers, whether arising under State or Federal laws, or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such Federal control, or with

any order ·of the President.   Actions at law or suits in equity may be brought by and against such carriers, and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the Federal government. * * * But no process, mesne or final, shall be levied against any property under such Federal control."

Pursuant to that statute, what are known as General Orders Nos. 50 and 50A were promulgated, of which the pertinent part here involved reads thus: "Whereas since the Director General assumed control of said system of transportation, suits are being brought and judgments and decrees rendered against carrier corporations on matters based on causes of action arising during Federal control for which the said carrier corporations are not responsible, and it is right and proper that the actions, suits and proceedings hereinafter referred to, based on causes of action arising during or out of Federal control, should be brought directly against the said Director General of Railroads and not against said corporations; It is therefore ordered that actions at law, suits in equity and proceedings in admiralty hereafter brought in any court, based on contract, binding upon the Director General of Railroads, claim for death or injury to person, or for loss and damage to property, arising since December 31, 1917, and growing out of the possession, use, control or operation of any railroad or system of transportation by the Director General of Railroads, which action, suit or proceeding but for Federal control might have been brought against the carrier company, shall be brought against the Director General of Railroads, and not otherwise; provided, however, that this order shall not apply to suits,

actions, or proceedings for the recovery of fines, penalties and forfeitures."

The conclusion from a fair consideration of the circumstances and of this language is, that the act of Congress and the proclamation were to interfere little with the accustomed processes of the courts during the period of Federal control, and to subject the Director General to the same general liabilities to which the railroad corporations would have been subjected but for that act, expressly denying, however, the right to levy on or against any of the property used while under the control of the Federal government and also relieving the Director General from all liability in actions, suits or proceedings for the recovery of fines, penalties, or forfeitures. In this we are confirmed by these clear expressions of the Supreme Court of the United States in the *Ault Case*, hereafter cited: "The plain purpose of the above provision was to preserve to the general public the rights and remedies against common carriers which it enjoyed at the time the railroads were taken over by the President, except in so far as such rights or remedies might interfere with the needs of Federal operation." * *

"The government was to operate the carriers, but the usual immunity of the sovereign from legal liability was not to prevent the enforcement of liability ordinarily incident to the operation of the carriers. The situation was analogous to that which would exist if there were a general receivership of each transportation system. Operation was to be continued as theretofore, with the whole personnel subject to change by executive order. The courts were to go on entertaining suits and entering judgments under existing law, but property in the hands of the President for war purposes was not to be disturbed. With that exception, the substantial

legal rights óf persons having dealings with the carriers were affected by the change in control." Such actions, in substance and effect, are against the United States. *Bailey* v. *Hines, Dir. Gen.,* 131 Va. 421, 109 S. E. 470; *Westbrook* v. *Director General* (D. C.), 263 Fed. 211; *Blevins* v. *Hines, Dir. Gen.* (D. C.), 264 Fed. 1005.

This construction has been uniformly applied, with one exception, so far as we are informed, though the facts of that case are not given. This exception is *Dougherty* v. *Payne, Director General of Railroads* (D. C. So. Dist. Fla.), 276 Fed. 451, where it is held that an action for malicious prosecution cannot be maintained against the Director General of Railroads, as such, for the act of one of the employees of the railroad system under his control. No reason for this conclusion is given in this opinion, and the facts of the case are not stated. We observe that in *Neely* v. *Payne, Dir. Gen.,* 126 Miss. 854, 89 South. 669, an action for alleged slander and libel against the Director General, was maintained, though a verdict in favor of the defendant on the issues of fact submitted was affirmed.

[10-12] 3. This record presents still another proposition. No actual damages were proved and the court gave several instructions, authorizing the jury to impose punitive damages upon the defendant. The amount of the verdict, $5,000, indicates that they have done so.

In thé case of *Missouri Pacific R. Co.* v. *Ault*, 256 U. S. 554, 65 L. Ed. 1087, 41 Sup. Ct. 593, there are expressions which indicate that in no event can punitive damages be imposed upon the Director General. The precise question there involved was, whether or not an Arkansas statute, which provided for the recovery of a penalty from railroad companies for delay in the payment of wages justly due employees, who had been discharged or refused further employment, was valid

against the Director General.    The act required the rate of wages theretofore paid to be paid from the date of discharge until payment, as a penalty, and under that statute an employee had recovered as wages $50, and $300 in addition thereto as the statutory penalty. The Supreme Court of Arkansas (140 Ark. 572, 216 S. W. 3) affirmed the judgment of the trial court, and the case was taken to the Supreme Court of the United States by writ of error.    In deciding that the Director General could not be subjected to this penalty, the court said: "The purpose for which the government permitted itself to be sued was compensation, not punishment.    In issuing General Order No. 50, the Director General was careful to confine the order to the limits set by the act, by concluding the first paragraph of the order: 'Provided, however, that this order shall not apply to actions, suits, or proceedings for the recovery of fines, penalties and forfeitures.'

"Wherever the law permitted compensatory damages they may be collected against the carrier while under Federal control.    Such damages may reasonably include interest and costs.    See *Hines* v. *Taylor*, 79 Fla. 218, 84 South. 381.    But double damages, penalties and forfeitures which do not merely compensate, but punish, are not within the purview of the statute. See *Hines* v. *Taylor*, *supra; Jackson-Tweed Lumber Co.* v. *Southern Ry. Co.*, 113 S. C. 236, 101 S. E. 924.    The amount recovered in the present case over and above the wages due and unpaid with interest is in the nature of a punishment.    It is called a penalty in the State statute.    The Supreme Court of Arkansas had held that it was not technically a penalty, declaring:

" 'It is allowed for a double purpose, as a compensation for the delay, and as a punishment for the failure to pay.    It is composed of all the elements and serves

all the purposes of exemplary damages.' *Leep* v. *Railway*, 58 Ark. 407, 440, 441, 25 S. W. 75, 85 (23 L. R. A. 264, 41 Am. St. Rep. 109).

"But whether in a proceeding against the Director General it shall be deemed compensation or a penalty presents a question not of State, but of Federal law. Whatever name be applied, the element of punishment clearly predominates and Congress has not given its consent that suits of this character be brought against the United States. The judgment against the Director General, so far as it provided for recovery of the penalty, was erroneous."

All of the cases cited in the above quotation related to statutory penalties, but as is thereby indicated statutory penalties are composed of all the elements and serve all the purposes of exemplary damages. Punishment of the offender as a deterrent example to others is the sole justification for awards of punitive or exemplary damages and we are unable to perceive any distinction between penalties imposed pursuant to the common law, and those imposed by statutory sanction. The Federal act prevents and supersedes the operation of the State statutes imposing penalties, and we cannot distinguish exemplary damages imposed under the Virginia statute for insulting words from other pecuniary exactions imposed as punishment under other statutes. We are of opinion, therefore, that the same rule must be applied thereto, and as the construction placed by the Supreme Court of the United States upon Federal statutes is controlling, it follows that all State laws which theretofore justified the imposition of penalties were abrogated during the period of Federal control of the railroads, and that the Federal government has not consented to be sued therefor.

It may be urged that the penalty by way of punitive

damages only attaches as incidental to a righteous claim for compensatory damages, but this does not differentiate it from the statutory penalty which was involved in the *Ault Case.* There, too, the penalty was attached to a righteous claim for a debt due the claimant, and the penalty was claimed only as an incident to such debt.

In this view we are confirmed by the case of *Davis, Director General,* v. *Elzey,* 126 Miss. 789, 89 So. 666. In that case the Mississippi court, in the same case, had previously held (88 South. 630) that punitive damages could be recovered of the Director General, but after the *Ault Case* was decided reversed its previous decision and in this connection said: "A careful consideration of this decision (*Ault Case*) by the Supreme Court of the United States, which is the court of final authority on this question, convinces us that we were in error, and that punitive damages may not be recovered against the government or the Director General." And the same court, in the cases of *Neely* v. *Payne, Dir. Gen.* 126 Miss. 854, 89 South. 672, and *Payne, Dir. Gen.* v. *Bartlett* (Miss.), 89 South, 912, reiterated its ruling and that construction of the *Ault Case.*

In *Ginn* v. *U. S. R. Administration,* 114 S. C. 236, 103 S. E. 549, an action for injury to a sick passenger, caused by exposure to a storm, it is said that "the Director General, representing the government, cannot be held to respond in punitive damages." It is also said in *Rowell* v. *Hines, Director General,* 114 S. C. 339, 103 S. E. 546, where a trespasser was injured in alighting from a train, that "The Director General could not be sued for wilfulness."

Our conclusion here, then, is that the instructions which authorized the recovery of punitive damages against the Director General were erroneous.

[13] There is still another aspect in which this case may be considered which leads to the same conclusion. The general rule is that punitive damages cannot be recovered against a principal for a slander uttered by one of its agents, unless it has either authorized and directed the utterance by the agent, or after knowledge thereof has ratified and approved it.

[14] In this case the evidence shows just the contrary. When the plaintiff reported the occurrence complained of to Mr. George W. Stevens, Federal Manager of the Chesapeake and Ohio Railway Company, he in substance replied that, if true, Mr. Warthen should offer an apology for his aspersions upon the plaintiff. King, the special agent, was promptly sent with the plaintiff to Warthen, and in the interview which ensued Warthen denied the utterance of the words complained of, and undertook to explain that he did not mean by the words which he actually did use to reflect upon the honesty or integrity of the plaintiff; and in substance that what he really meant was, that it was impossbile for him to know either whether the driver who took the eggs from the car was the agent of the plaintiff, or that he did not take them to the plaintiff, but that he did not thereby mean to impute that the plaintiff would consciously connive with the driver to effect such a fraudulent purpose. There being no evidence that the federal agent or the Director General ever at any time authorized, ratified, or approved, the offensive charge, the instructions authorizing the recovery of punitive damages are erroneous.

[15] The circumstance which seems to be most relied upon to show ratification is that when the plaintiff threatened suit, Warthen sent the letter to the Director General's attorney. The Director General had the right to defend the action. He has not pleaded

justification, but only tendered the general issue of not guilty, and this does not afford the slightest evidence of ratification. Inasmuch as the suit was threatened against the Director General and was promptly instituted against him, this circumstance does not even tend to show ratification.

[16] Having reached these conclusions, we must determine, under Code, section 6365, as to the judgment to be entered here. That section requires this court, when judgments are reversed in whole or in part because erroneous, to "enter such judgment, decree or order as to the court shall seem right and proper, and shall render final judgment upon the merits whenever, in the opinion of the court, the facts before it are such as to enable the court to attain the ends of justice."

In this connection we observe that in Mississippi, which has a statute substantially like the Virginia statute, making insulting words actionable, in the case of *Dixie Fire Ins. Co.* v. *Betty,* 101 Miss. 880, 58 South. 705, that court construing the statute held that in no event could a suit be maintained to hold a principal liable for insulting words spoken by an agent, unless possibly in a case where such words were spoken at the command of the principal, using this language: "Over the objection of the appellant, appellee was permitted to amend his declaration by adding a count predicated on section 10, Code, 1906, by which certain words are made actionable. In so doing the court committed fatal error. This section has no application in a suit to hold a principal liable for words spoken by an agent, unless possibly such words were spoken at the command of the principal, as to which we express no opinion. Its language, together with the fact that its first appearance in our statutes was as section 9 of the act to suppress dueling, passed June 13, 1822 (Rev. Code of Laws 1824,

Ch. 50), demonstrates that its enactment was for the purpose of preventing personal difficulties, and that consequently it applies only to persons liable to become involved in such a difficulty by reason of having referred to another in words of the character therein mentioned."

This contruction of the statute was reaffirmed in *Neely* v. *Payne, Director General, supra.*

It should doubtless be subject to the further qualification that the insulting words were neither authorized nor ratified by the principal.

While this question has never been raised in Virginia, we are greatly impressed by the reasonableness of this construction of the statute, and the expressions contained in the Virginia cases are insufficient to discredit its logic.

In *Brown* v. *N. & W. Ry. Co.*, 100 Va. 624, 42 S. E. 665, 60 L. R. A. 472, there was an action for libel and for insulting words under the statute, published by an agent of the defendant. The defendant demurred to the evidence and the court used this language: "This case was heard in the trial court on a demurrer to the evidence, but the plaintiff voluntarily joined in the demurrer. Whether he could have been compelled to join if the action had been brought for common law libel simply, is unnecessary to decide. Section 2897 of the Code, however, provides that 'all words which, from their usual construction and common acceptation, are construed as insults and tend to the breach of the peace, shall be actionable. No demurrer shall preclude a jury from passing thereon.' The latter provision was evidently inserted for the benefit of plaintiffs in actions to which the section is applicable, and they have the right to waive it if they choose. Counsel for the plaintiff in the trial court, bearing in mind this statute, intended

to waive the benefit of it expressly, as is manifest from his bill of exception, which states that 'after the evidence was all introduced to the jury, the defendant demurred to the testimony, and the plaintiff being willing to join therein, notwithstanding the last count of the declaration'—which was a count under section 2897 of the Code—'joined in the demurrer.' This he had a right to do." And the judgment of the trial court upon this demurrer, in favor of the defendant, was affirmed.

In *Sun Life Ins. Co.* v. *Bailey, supra,* which was also an action for libel at common law, and for insulting words under the statute, published and uttered by an agent of the defendant, the court reversed the judgment for the plaintiff, because the jury were instructed that it was not "incumbent upon the plaintiff to prove any special damages, and if they find for the plaintiff they shall find such damages as they think he is entitled to under all the circumstances as shown in the evidence. And in ascertaining the damages they may consider the plaintiff's standing and that of the defendant." And in this connection said: "The court had properly, in another instruction, told the jury that this action being against the defendant corporation, of which the writer of the letter sued on was the agent, they could not give punitive or exemplary damages,. unless they believed from the evidence that the alleged libel of the agent was either authorized by the defendant or was subsequently ratified by it, and there being no evidence whatever tending to show that the defendant (plaintiff in error) either authorized or ratified the act of Bartow in writing and mailing the letter sued on, but on the contrary the evidence being distinct and uncontradicted that the company's chief officers knew nothing of the writing of the letter until the institution of this suit, it was clearly erroneous to tell the jury that in ascertaining the dam-

ages they might allow the plaintiff, the standing of the defendant company might be considered."

We know of no other cases which have reached this court except these two, in which actions have been maintained against principals for insulting words uttered by their agents, and both of these cases were actions for common law libel as well as for insulting words under the statute.

Then in *Boyd* v. *Boyd*, 116 Va. 326, 82 S. E. 110, Ann. Cas. 1916D, 117 3, there was an action based on the statute. It appeared that a stepson had published grossly insulting words of his stepmother, but there was no evidence of actual damage, and the court was asked to set aside a substantial verdict upon the ground that in the absence of actual damage, there can be no recovery of punitive damages under the Virginia statute. This court said: "It is unnecessary in this case to consider whether or not publication is necessary to maintain an action for insulting words, since if it be it is clear that there was a publication in this case. Neither was it necessary for the plaintiff to prove actual pecuniary loss resulting from the utterance of the insulting words in order that the jury might give punitive damages. The law presumes that damages result from the utterance of insulting words, made actionable by our statute, just as it does where the words uttered are actionable *per se;* and it is not necessary in either case, in order to recover, to prove actual or pecuniary loss."

Applying the suggestions contained in these cases, we have here an action for insulting words where no actual damages are proved, and where, as a necessary consequence, the only damages which can be recovered are punitive damages, and this only because of the Virginia statute authorizing the recovery of such punitive damages for insulting words. As we have undertaken to

show, however, this plaintiff cannot recover punitive
damages of the Director General on account of insult-
ing words uttered by its agent for two reasons—first,
because the Federal government has not consented that
the Director General shall be penalized or subjected to
punitive damages imposed by statute, and, second, be-
cause in this case there has been no ratification of the
insulting words by the Director General.   No actual
damages have been proved, and hence the only possibl-
recovery in this case is for exemplary or punitive dame
ages.   This being true, it is logical to hold that the
plaintiff has failed in his proof to show that he is en-
titled to any damages against the Director General,
however clear his right may appear to be, under the
statute, to have submitted to a jury his right to penalize
or recover punitive damages of Warthen, who uttered
the insulting words.   Our conclusion, therefore, is, in
accordance with Code section 6365, to enter final judg-
ment here in favor of the Director General.

*Reversed:*

REHEARD JUNE 14, 1923.

BURKS, J., delivered the opinion of the court.

[17] In the former opinion we held that punitive dam-
ages could not be recovered against the Director Gen-
eral.  *Director General* v. *Gravins* (Va.),  112 S. E. 869.
We adhere to that conclusion for the reasons stated in
the opinion, and also because punitive damages cannot
be awarded against a corporation for the act of its ser-
vant, unless such act was previously authorized or sub-
sequently ratified by the corporation, whether the ques-
tion be one of Federal or State law.  *Lake Shore, etc., R.
Co.* v. *Prentice*, 147 U. S. 101, 13 Sup. Ct. 261, 37 L. Ed.

97; *Southern R. Co.* v. *Grubbs*, 115 Va. 876, 80 S. E. 749. The right to award such damages did not exist prior to Federal control, and was not conferred by the act of Congress (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, § §3115¾a-3115¾ p) authorizing such control.

[18] In the order granting a rehearing, two questions were submitted for re-argument by counsel and for reconsideration by the court. They were, (1) Does the statute authorizing an action for insulting words impose a liability upon a master for compensatory damages, for insulting words uttered by his agent in the course of his employment, when such words are neither authorized nor ratified by the employer?" and (2) "If so, is there any difference in this respect between the Director General of Railroads and any other employer?"

The first of these questions was considered and discussed in the former opinion, but, upon the rehearing, the members of the court were not in harmony on the subject. Upon the second question, however, we are of opinion that the action against the Director General cannot be maintained, for the reasons hereinafter stated, and that renders any expression of opinion on the first question unnecessary. The proper answer to that question is therefore left open for future consideration when it shall be necessary to answer it.

Assuming for the purposes of the case, that a corporation is liable for *compensatory damages* under the facts stated in the first question, "Is there any difference in this respect between the Director General of Railroads and any other employer?" We are of opinion that there is.

[19] When the Federal government took possession and control of all the railroads of the country, it had the power to forbid any actions or suits against it growing

out of their operation, or, if it permitted such actions or suits, to prescribe in what courts, for what causes of action, within what time, and upon what terms and conditions, it would permit itself to be sued. It chose the latter course, and gave expression to its will in what is designated as the Federal control act, 40 Stat. 451 (Comp. Stat. 1918, sec. 3113¾-j). Section 10 of that act, so far as need be recited, is as follows:

[20] "Carriers while under Federal control shall be subject to all laws and liabilities as common carriers, whether arising under State or Federal laws, or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such Federal control, or with any order of the President. Actions at law or suits in equity may be brought by and against such carriers, and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the Federal Government.   *   * But no process, mesne or final, shall be levied against any property under such Federal control."

By the terms of this section the companies were left subject to suit as before Federal control, except so far as not inconsistent with that act, or other acts applicable to Federal control, or "*with any order of the President,*" but the plaintiff was prohibited from enforcing the judgment against any property under Federal control. The President, through the Director General, in pursuance of the policy of the act, promulgated General Order No. 50a, which so far as need be recited, is as follows:

"Whereas, since the Director General assumed control of said system of transportation, suits are being brought and judgments and decrees rendered against

carrier corporations on matters based on causes of action arising during Federal control for which the said carrier corporations are not responsible, and it is right and proper that the actions, suits, and proceedings hereinafter referred to, based on causes of action arising during or out of Federal control, should be brought directly against the said Director General of Railroads and not against said corporations: It is therefore ordered that actions at law, suits in equity and proceedings in admiralty hereafter brought in any court, based on contract, binding upon the Director General of Railroads, claim for death or injury to person, or for loss and damage to property, arising since December 31, 1917, and growing out of the possession, use, control, or operation of any railroad, or system of transportation, by the Director General of Railroads, which action, suit or proceeding but for Federal control might have been brought against the carrier company, shall be brought against the Director General of Railroads, and not otherwise: Provided, however, that this order shall not apply to suits, actions, or proceedings, for the recovery of fines, penalties and forfeitures.''

It will be observed that this ''order of the President'' put some limitation on the rights of litigants which they would otherwise have had but for that order. It forbids any recovery of ''fines, penalties and forfeitures,'' and it also limited the causes of action for which actions or suits might be brought to those (1) based on contracts, binding upon the Director General of Railroads, (2) claims for death, (3) claims for injury to person, and (4) claims for loss or damage to property. The validity of order 50a was expressly upheld as to fines, penalties and forfeitures in *Missouri Pac. R. Co.* v. *Ault*, 256 U. S. 554, 41 Sup. Ct. 593, 65 L. Ed. 1087; and in *Alabama & V. R. Co.* v. *Journey*, 257 U. S. 111, 42 Sup.

Ct. 6, 66 L. Ed. 154, a general order of the Director General prescribing the venue of suits under the Federal control act was upheld on the ground that enforcement of liability under the act was permitted only "in so far as (not) inconsistent * * * with any order of the President."

In *Ellis* v. *Atlanta B. & A. R. Co.* (D. C.), 270 Fed. 279, from the northern district of Georgia, Sibley, J., quotes from section 10 of the Federal control act the following: "Carriers while under Federal control shall be subject to all laws and liabilities as common carriers, whether arising under State or Federal laws, or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such Federal control, or with any order of the President." Of this provision, he says: "Though this sentence relates rather to the existence of the liability than to the mode of its enforcement, it clearly authorizes the President to withdraw liability altogether to any extent to which he may find its existence incompatible with the purpose of the government control."

The power of the President to make, and the validity of, general order No. 50a seem to be fully sustained by the cases cited. It seems manifest also that one of the objects of the order was to limit the causes of action upon which the government gave its consent to be sued to the classes of cases hereinbefore mentioned. No other reason can be assigned for the classification of the causes of action mentioned in the order. If it was not intended to impose a restriction, there was no necessity or propriety in making the classification, as the statute otherwise covered the whole ground. The statute, however, while giving very comprehensive rights of action, expressly excepted cases that were inconsistent with "any order of the President," and the President deemed

it wise to restrict the right to the classes of cases designated in general order No. 50a. The term "claim for death or injury to person" shows plainly that the injury to person referred to was a physical injury to the person and not an injury to the feelings or reputation. He withdrew all other causes of action from the operation of the act, and restricted the right to sue to the classes of cases mentioned.

There were good reasons for the restriction. The government had assumed large pecuniary obligations, and while it desired to put the public to as little inconvenience as possible in asserting demands of a substantial nature, it recognized the necessity of conserving the assets of the companies, and to this end cut off the right of recovery of fines, penalties and forfeitures, and for invisible injuries the existence of which could not be disproved and for which the law provided no measure of compensation, such as mental anguish for a private insult. Under the Federal control act, there was guaranteed by the government during Federal control to each transportation company taken over, as a just compensation, "an annual sum, payable from time to time in reasonable installments, for each year and *pro rata* for any fractional year of such Federal control, not exceeding a sum equivalent as nearly as may be to its annual railway operating income for the three years ended June 30, 1917."

"Beyond doubt also, for the purpose of enabling the United States to perform the obligation which it assumed and to secure it from ultimate loss from the pecuniary responsibilities which might result, including the repayment to it of an appropriation of $500,000,000, which the act made applicable, all of the earnings of the railroad were by the act expressly made the property of the United States." *Northern Pac. R. Co.* v. *North*

*Dakota,* 250 U. S. 135, 145, 39 Sup. Ct. 502, 504, 63 L. Ed. 897.

To meet these heavy obligations, it was necessary not only to have a conservative economic administration of the affairs of the railroad companies, but also to cut off litigation of the class of the case at bar, where no physical injury was inflicted, no damage done to property, no contract violated, and where the scales of justice could not be so adjusted as to measure in dollars and cents the extent of the mental hurt inflicted. It is clear from the collection of the words, that mere mental anguish was not an "injury to person," within the meaning of the general order.

It may be that there are some general expressions in the opinion in the *Ault Case,* which, taken in the abstract, militate against the conclusion we have reached, but the court was there dealing with an entirely different state of facts and its generalizations must be read in the light of the facts of that case. It was not called upon to determine whether or not general order No. 50a classified the cases in which actions or suits might be brought against the government, and did not consider that question. It had no such question in mind, and it cannot be said that a court has decided a question which it did not have in mind or intend to decide.

For the reasons stated, we adhere to the judgment heretofore entered in the case.

*Reversed.*

SIMS, J., dissenting:

I find myself unable to agree with the position taken in the majority opinion, that the action in the instant case (for defamatory words made actionable by the statute), is not an action for "injury to person," so that it is not embraced in that class of actions permitted by

General Order No. 50a, promulgated by the President through the Director General pursuant to section 10 of the Federal control act. The classification made by the opinion, putting the action involved in a class by itself, unembraced in the class of actions for "injury to person," is entirely novel, so far as I have been able to discover. No authority in support of it is cited in the opinion or in the petition or briefs in the case, except the *Ault Case* referred to in the petition. The opinion of the court, delivered by Judge Prentis on the former hearing, correctly interprets that case, as I think.

According to Blackstone (3 Blackstone's Com. 117), there are three classes which embrace all suits and actions, namely: "Actions personal, real and mixed." As said by that learned work: "Personal actions are such whereby a man claims a debt or personal duty, or damages in lieu thereof; and, likewise, whereby a man claims a satisfaction in damages for some *injury* done *to his person* or property. The former are said to be founded on contracts, the latter upon torts or wrongs; * * *. Of the former nature are all actions upon debt or promises; of the latter, *all actions* for trespasses, nuisances, assaults, *defamatory words*, and the like." (Italics supplied.) See also 3 *Idem* 119-128; 1 *Idem* 129-140.

As said in *Porter* v. *Mack*, 50 W. Va. 581, 593, 40 S. E. 459, 464: "A libel or slander might deprive a man of employment, destroy his credit, ruin his business and greatly impair his estate; yet an action therefor would be an action for a *personal injury*, the effect of the wrong on the estate of the injured party being merely incidental. So in this case. The *personal injury* is the gravamen of the action, and the effect of the alleged malicious acts of the defendant upon the estate of the plaintiff is incidental merely. Such an effect is an element to be

considered in assessing damages, *but does not and cannot change the character of the action.*"

And all of the text writers and decisions on the subject, in England and in America, are, as I believe, in accord and to the same effect.

· Therefore, I cannot think that the language of General Order No. 50a, expressly permitting "actions at law" against the Director General, "based on  *  *  claim for  *  *  injury to person," can be properly construed as having reference to any different classification of such actions than the aforesaid classification, which, according to the long settled understanding of text writers and decisions on the subject, embraces all actions for defamatory words.

General Order No. 50a (the order of the President) did put a limitation on the kinds of actions which litigants would otherwise have had the right to institute under the permission given by section 10 of the Federal control act, namely: it forbid any recovery of "fines, penalties and forfeitures;" but manifestly that express limitation was inserted in the order for the reason that the definition "actions at law  *  *  based on  *  *  claim for injury to person" also embraced actions by individuals for such recoveries, as well as actions for defamatory words, and other personal actions; and the President desired to forbid recoveries of fines, penalties and forfeitures.  But for this restriction, actions by individuals for fines, penalties and forfeitures would have been permitted, because embraced in the definition of personal actions last mentioned.

None of the other classifications contained in the order could have embraced any of the last named recoveries.  And to my mind the express proviso contained in the order forbidding such recoveries, without more, by strong implication indicates that the true construc-

tion of the order is that it permits recoveries in all other personal actions, including actions for defamatory words. Surely the forbidding of recoveries in actions for defamatory words, if intended, would have been expressed by the inclusion thereof in the proviso; and they would not have been left to be ascertained by the courts by the novel expedient of excluding from the classification of personal actions made in the order actions for defamatory words, which, from time immemorial, have been considered to be embraced in that classification.

The presence of most of the specific mention in detail of the suits, actions and proceedings permitted, contained in General Order No. 50a, seems to me to be fully accounted for by considering that they were inserted therein to remove the ambiguity of the general terms of section 10 of the Federal control act and to put an end to the various constructions which had been and were being given to that section by the different Federal and State courts, as shown by their decisions prior to such order.

The specific mention of actions based on "claim for death" was indeed plainly induced by the fact that such actions are not based on "injury to person," within the settled meaning of those terms; and that, I think, is all the significance that is to be attached to the association of these respective terms in the general order, separated by the disjunctive "or." The specific provisions permitting actions "for loss and damage to property," were, strictly speaking, not necessary, in view of the provision permitting actions for "injury to person." Similarly, it was unnecessary for the order to have been more specific in its other provisions on the subject under consideration than was section 10 of the Federal control act. But the provisions were made so specific, as it seems to me, with the sole purpose of making it plain that all actions, suits and proceedings—all actions of

tort, as well as on contract, all suits in equity and in admiralty—which might have been maintained against common carriers, as provided by law at the time the Federal control act went into effect, were permitted by the General Order No. 50a, in accordance with the clear intendment of section 10 of the Federal control act, except as expressly restricted by the aforesaid proviso in the single particular of actions to recover fines, penalties and forfeitures. That is to say the object of the general order in being so specific was, as I think, not restrictive in its purpose, except as specifically stated in the proviso, but precisely the contrary.

When read together, General Order No. 50a and section 10 of the Federal control act, permitted actions against the Director General for "injury to person" (which, as aforesaid, include such an action as that in the instant case), where the cause of action arose since December 31, 1917, and while the railroad was under Federal control (both being true of the instant case), and where the liability arose "under State       *       * law" (as was the situation in the instant case), by virtue of the statute (Code 1919, sec. 5781), with the single exception that no such actions were permitted for the recovery of fines, penalties or forfeitures. That is to say, the liability of the Director General, under said order and section 10 was identical with that which would have attached to the railway corporation before the Director General took possession, except that no recovery against the latter of fines, penalties or forfeitures was permitted.

I therefore think that the action in the instant case is maintainable against the Director General for compensatory damages, and that the case should be remanded for a new trial for the assessment of such damages.

WEST, J., concurs in this dissenting opinion.