### WESTBROOK et al. v. DIRECTOR GENERAL OF RAILROADS.

(District Court, N. D. Georgia. January 29, 1920.)

1. REMOVAL OF CAUSES ⊚26—ACTION AGAINST DIRECTOR GENERAL OF RAILROADS NOT REMOVABLE ON GROUND OF DIVERSITY OF CITIZENSHIP, WHERE CORPORATION IS RESIDENT.

   An action in a state court against the Director General of Railroads, as government operator of a line of railroad, is not removable on the ground of diversity of citizenship between plaintiff and the corporation owning such line.

2. REMOVAL OF CAUSES ⊚19(1)—ACTION FOR NEGLIGENCE IN OPERATION OF ROAD BY DIRECTOR GENERAL REMOVABLE AS ONE "ARISING UNDER THE LAWS OF THE UNITED STATES."

   An action in a state court against the Director General of Railroads, based on negligence in the operation of a railroad by him under authority of an act of Congress, is one "arising under the laws of the United States," and removable on that ground.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Arising.]

3. COURTS ⊚302—ACTION FOR NEGLIGENCE IN OPERATION OF ROAD BY DIRECTOR GENERAL OF RAILROADS INVOLVES CONTROVERSY TO WHICH UNITED STATES IS PARTY.

   An action against the Director General of Railroads, arising out of his operation of a railroad line, involves a controversy to which the United States is a party, and is within the jurisdiction of a federal court.

4. RAILROADS ⊚5½, New, vol. 6A Key-No. Series—"CARRIER" UNDER FEDERAL CONTROL DEFINED.

   In Federal Control Act, § 10 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115¾j), providing that "carriers while under federal control"

⊚For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

shall be subject to suits, etc., the word "carriers" means the United States, as operator of each of several railroads.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Carrier.]

5. COURTS ⬥⬥326—JURISDICTION OF DISTRICT COURT OF CLAIMS AGAINST UNITED STATES.

Federal Control Act, § 10 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115¾j), providing that "actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law," provides a code of procedure for this class of claims against the United States totally different from that provided for other claims, and the limitation imposed by Judicial Code, § 24 (20), Comp. St. § 991 (20), on the jurisdiction of District Courts to claims not exceeding $10,000, does not apply to such suits.

At Law. Action by Charles O. Westbrook and others against Director General of Railroads. On motion to remand to state court. Denied.

Reuben R. Arnold, of Atlanta, Ga., for plaintiffs.

Tye, Peeples & Tye, of Atlanta, Ga., for defendant.

SIBLEY, District Judge. Four suits, each for $25,000, were brought in the state court, for personal injuries and homicides inflicted during federal control, against "the Director General of Railroads of the United States, appointed by the President of the United States and acting under an act of Congress, and engaged in the operation of the line of the Louisville & Nashville Railroad Company." They were removed on the grounds: (1) That plaintiffs are citizens and residents of Georgia, and the Louisville & Nashville Railroad Company, to whom the defendant succeeded in operating the railroads, is a citizen of Kentucky, and would before federal control have been entitled to remove for diverse citizenship; (2) that the cases arise under the Constitution and laws of the United States and orders of the Director General made in pursuance thereof, and are controversies to which the United States are a party. Motions to remand, while admitting the facts claimed, deny the jurisdiction of this court, because diverse citizenship is not shown, and because the cases, if arising under the laws of the United States, are claims against the United States for more than $10,000, of which this court is denied jurisdiction by Judicial Code, § 24 (20), Comp. St. § 991.

[1] 1. The Louisville & Nashville Railroad Company is neither a party of record nor in interest, and its citizenship is immaterial as a direct ground of jurisdiction. Since the District Court exercises only that jurisdiction which Congress within the constitutional limits grants, even where diversity of citizenship exists, jurisdiction may be denied, as in Judicial Code, § 24 (1), where the original parties to an assigned chose in action are not citizens of different states. But it does not follow that a fictitious diverse citizenship, based on that of some person who might have been, but is not, sued or suable, will avail. Congress could not make suits against the Director General re-

movable merely because they would have been if brought against the railroad company owning a railroad.

The Director General of Railroads is not here sued as an individual, or even by name, but as an officer, and stands for the United States, as both parties concede. An officer of the government is not individually liable for his acts within his authority.

"We are not aware that it is disputed that, when the act of a public officer is authorized or has been adopted by the sovereign power, whatever the immunities of the sovereign, the agent thereafter cannot be pursued." The Paquete Habana, 189 U. S. 465, 23 Sup. Ct. 594, 47 L. Ed. 900.

See, also, Spalding v. Vilas, 161 U. S. 483, 16 Sup. Ct. 631, 40 L. Ed. 780.

When sued officially, neither is the officer nor the government a citizen of any state. No jurisdiction on account of diverse citizenship exists in these cases.

[2, 3] 2. But there is a "case at law arising under the laws of the United States." Each petition avers that the defendant was acting under an act of Congress in operating the railroad, and is for that reason liable. The liability depends on the construction and application of this act. Pacific Removal Cases, 115 U. S. 1, 5 Sup. Ct. 1113, 29 L. Ed. 319; T. & P. R. R. v. Cody, 166 U. S. 606, 17 Sup. Ct. 703, 41 L. Ed. 1132; Railroad v. Mississippi, 102 U. S. 135, 26 L. Ed. 96. Moreover, these are "controversies to which the United States are a party." Though in name against an officer, in fact they assert a liability of the government, and a judgment will be paid out of its funds. On a question of jurisdiction they will be treated as suits against the United States.

"It may be said that the United States is not named as a defendant, and therefore cannot be considered a party to the controversy. * * * The controversy is made by the act of 1901 one to which the United States is a party in interest, to be directly affected by the result, and therefore the case is within the first paragraph, as one to which the judicial power of the United States extends. * * * And the United States is to be taken, for the purposes of this case, as the real party in interest adverse to the state. We are of the opinion, therefore, that this court has jurisdiction of this controversy, and is called upon to determine the case on its merits." Minnesota v. Hitchcock, 185 U. S. 373, 386, 388, 22 Sup. Ct. 650, 655, 656 (46 L. Ed. 954).

See, also, Oregon v. Hitchcock, 202 U. S. 60, 26 Sup. Ct. 568, 50 L. Ed. 935; Naganab v. Hitchcock, 202 U. S. 473, 26 Sup. Ct. 667, 50 L. Ed. 1113; Kansas v. United States, 204 U. S. 331, 341, 27 Sup. Ct. 388, 391 (51 L. Ed. 510) where it is said:

"If whether the suit is one against the state is to be determined, not by the fact of the party named as defendant on the record, but by the result of the judgment or decree which may be entered, the same rule must apply to the United States. The question whether the United States is a party to the controversy is not determined by the merely nominal party on the record, but by the question of the effect of the judgment or decree which can be entered."

This, while affording another ground of jurisdiction, is the occasion of further difficulty.

"The United States cannot be sued in their courts without their consent and in granting such consent Congress has an absolute discretion to speci-

fy the cases and contingencies in which the liability of the government is submitted to the courts for judicial determination. Beyond the letter of such consent, the courts may not go, no matter how beneficial they may deem or in fact might be their possession of a larger jurisdiction over the liabilities of the government." Schillinger v. United States, 155 U. S. 163, 15 Sup. Ct. 85, 39 L. Ed. 108.

"Jurisdiction cannot be exercised by the Circuit Court in a suit against the United States, or against any other party, unless the plaintiff can bring his case within some act of Congress." United States v. Eckford, 6 Wall. 488 (18 L. Ed. 920).

See, also, Naganab v. Hitchcock, 202 U. S. 473, 26 Sup. Ct. 667, 50 L. Ed. 1113.

Under previous laws the United States were not suable for any tort. Bigby v. United States, 188 U. S. 400, 23 Sup. Ct. 468, 47 L. Ed. 519.

By an act of August 29, 1916 (Comp. St. § 1974a), the President, in time of war, was empowered to take possession and assume control of any system of transportation and utilize the same as stated in the act. No details were prescribed and no provision made for a *name* under which the government activity was to be exercised as was done in the case of the Alaska railroads by the first sentence of section 1 of the act of March 12, 1914 (38 Stat. 305 [Comp. St. § 3593a]). By the proclamation of December 26, 1917 (Comp. St. § 1974a), the President did "take possession and assume control of the systems of transportation," and committed the "possession, control, *operation* and utilization" of them to a Director General of Railroads, providing that "said Director may perform the duties imposed upon him *so long and to such extent as he shall determine, through* the boards of directors, receivers, officers and employés of said systems of transportation," and until otherwise ordered these officers and employés were directed to "continue the operation thereof in the usual and ordinary course of business of common carriers *in the names* of their respective companies." Existing laws were continued, but it was ordained that—

"Any orders, general or special, hereafter made by said Director General shall have paramount authority and *be obeyed as such.*"

Agreements with "the several companies" were to be negotiated, looking to their compensation for the use of their property, based on their average "net operating income" for the three years previous to June 30, 1917. The Federal Control Act of March 21, 1918 (Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 3115¾a et seq.), ratified the action of the President and left untouched or amplified the arrangements of the proclamation. "Average annual railway operating income" for three years prior to June 30, 1917, was made the basis for compensation, ascertained under the system of accounting required by the Interstate Commerce Commission. A revolving fund of $500,000,000 was provided, to be combined with the operating income from the transportation systems and used "to pay the expenses of federal control" and for other purposes. It was enacted (section 12) that—

"Moneys and property derived from the operation of the carriers during federal control are hereby declared to be *the property of the United States.*"

The effect of the President's action and this act was not to take over the corporate owners of the transportation systems or their franchises, but only their properties.  Postal Telegraph Co. v. Call, 255 Fed. 850, —— C. C. A. ——.  The persons who had been officers and employés of the owning companies ceased in general to be such and became agents and employés of the Director General.  Service of process upon them no longer bound their former employers.  Southern Cotton Oil Co. v. A. C. L. R. R. Co. (D. C.) 257 Fed. 138; Wood v. Clyde S. S. Co. (D. C.) 257 Fed. 879.  The federal control was exclusive and complete.  Northern Pacific Railroad Co. v. North Dakota, 250 U. S. 135, .39 Sup. Ct. 502, 63 L. Ed. 897.  Plainly, therefore, railroad operations became those of the United States, no matter in whose name carried on.  They were for months carried on over each line of railroad in the name of its owner, but these names were all aliases of the United States.  The inevitable confusion of names with rights occurred, and the Director General issued his General Orders 50 and 50a, directing suits to be brought against his official title, and providing, perhaps unnecessarily, for service on his agents.

Since the owning companies could no longer control, the railroad officials and employés were not their agents, and the companies could not be held for their acts.  Brady v. C. & G. W. R. R. Co., 114 Fed. 100, 105, 107, 52 C. C. A. 48, 57 L. R. A. 712.  The United States owned what was earned, and they alone could be treated as the business operator of each railroad.  The compensation to be paid the owners was an "average annual railway operating income," to be ascertained from the reports to the Interstate Commerce Commission.  This is a technical expression, having a definite meaning in railroad accounting.  It embraces the results of railway operation, as distinguished from income from other sources, and is not gross "operating revenue," but such revenue decreased by "operating expenses."  In the operating expenses are included losses from personal injury and the like, such as are sued for here.  The compensation to be made is therefore decreased already by an assumed fair average allowance for such liabilities, and to impose in addition the actual liabilities accruing under government operation would deprive the compensation of all justness, as well as take the owners' property without due process of law.  If liabilities arising during government operation are to be recognized at all, manifestly they should be recognized as liabilities of the United States, at least to the extent that the "revolving fund" would pay them, while to make them liabilities of the owning companies would be unconstitutional; for the war power itself is subject to other applicable constitutional provisions.  Hamilton, Collector, v. Kentucky Distillery Co. (Oct. Term, 1919) 251 U. S. 146, 40 Sup. Ct. 106, 64 L. Ed. ——; Ex parte Milligan, 4 Wall. 2, 121, 127, 18 L. Ed. 281; McCray v. United States, 195 U. S. 27, 61, 24 Sup. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561.  And a construction of even doubtful constitutionality is to be avoided.  United States v. Jin Fuey Moy, 241 U. S. 394, 401, 36 Sup. Ct. 658, 60 L. Ed. 1061, Ann. Cas. 1917D, 854; United States v. D. & H. Co., 213 U. S. 366, 29 Sup. Ct. 527, 53 L. Ed. 836.

[4] While the business was still being carried on *in the names* of the

several owners, section 10 of the Federal Control Act was enacted. Its pertinent provisions are:

"That carriers, while under federal control, are subject to all laws and liabilities as common carriers, whether arising under state or federal laws or at common law, except in so far as may be inconsistent with the provisions of this act or any other act applicable to such federal control, or with any order of the President. Actions at law or suits in equity may be brought by and against such carriers and judgments rendered as now provided by law; and in any action at law or suit in equity against the carrier, no defense shall be made thereto upon the ground that the carrier is an instrumentality or agency of the federal government, nor shall any such carrier be entitled to have transferred to a federal court any action heretofore or hereafter instituted by or against it, which action was not so transferrable prior to the federal control of such carrier."

By the term "carriers while under federal control" is here meant the United States as operator of each several railroad. The word "carrier" most often in the act refers to the transportation companies mentioned in its title as "owners." Such must be its meaning in the provisions relating to the agreements to be made between the government and the companies, and to division of taxes and other matters. But Congress itself, in the opening sentence of the act, declared that "carriers" was to be used as the equivalent of "railroads and transportation systems." Yet it must be in the popular sense in which one uses the word "railroad," in such expressions as "suing the railroad," "working for the railroad," "the railroads are active in politics," where by a metonymy the name of the physical thing is used for its controller, whether corporation, receiver, or government. The term "railroads" might have been used in this loose sense anywhere in the act, instead of "carriers," except that water transportation was also intended to be covered.

In section 10, however, aside from the question of *power* to make its enactments as applied to the owning corporations, there was certainly no *necessity* for declaring that *they* should remain under the laws as formerly and subject to the same statutes, for they would naturally so remain as to all matters for which they were liable; nor for denying to them the right to defend as instrumentalities of the government, for they *were not such*; nor could any enlarged right to remove their suits be supposed to exist for the reason that the government had taken their property and was operating it. The denial of the right to levy was a sufficient protection, if not the limit of Congressional authority as to suits against these corporations on their liabilities. But as applied to the governmental operation of the transportation systems every provision becomes a code. The first sentence, declaring that the carriers, while under federal control, shall be subject to all laws and liabilities as common carriers, state, federal, or at common law, created a liability on the part of the United States for every act and omission for which liability had formerly attached to the owners in their business as common carriers. The reserved right to alter these by orders of the President was a power to quickly withdraw this liability to any extent found to be needful. Thus Congress made the railroads' liabilities to patrons, employés, and the public arising under federal control to be "claims against the United States.".

Had the legislation stopped here, such claims would have fallen within the definite jurisdiction of the Court of Claims above $10,000, and of the District Court below $10,000; jurisdiction in the state courts being excluded. The enforcement of such a claim is, however, not a case at law, and a jury trial is not accorded in either court. McElrath v. United States, 102 U. S. 426, 440, 26 L. Ed. 189. So when Congress proceeded to enact that "*cases at law and suits in equity* may be brought by and against such carriers and judgments rendered *as now provided by law*," a code of procedure was provided for this class of claims against the United States totally different from that provided for other claims. Since these suits at law and in equity were not only to be *brought* but were to *proceed to judgment* as before, all that could properly arise in the way of procedure, including removal for trial to the federal court of suits begun in state courts, was covered and to be done "as now provided by law."

Again, had the legislation stopped, the suits might have been embarrassed by a plea of governmental agency, and this was next prohibited. And all suits in state courts would have been removable as arising under the laws of the United States, and as being controversies to which the United States were a party; but the right of removal was restricted to such cases only as would have been removable had not federal control occurred. The plain purpose of Congress was to have the rights of all persons having claims against the railroads unembarrassed in substance or procedure by governmental operation. This end was within the constitutional power of Congress, and what could have been done had governmental control not occurred is used not to create a fictitious jurisdiction in the federal courts, but only to *restrict* a real jurisdiction. No obstacle, therefore, appears to suing in the District Court any such claims against the United States which, as one against the railroad operated, could have been so sued, though the real ground of jurisdiction is different; and similarly no obstacle exists to removal.

General Orders 50 and 50a are a full recognition by the Director General of the government's liability to be sued, as above pointed out, but should not be considered the authority for it. While great power was given him, so great an one as that of subjecting the United States to suits at his will and prescribing the form of procedure ought not rashly to be conceded to any official. Carr v. United States, 98 U. S. 433, 434, 25 L. Ed. 209; Stanley v. Schwalby, 162 U. S. 255, 16 Sup. Ct. 754, 40 L. Ed. 960. The orders really deal only with a matter of *name,* in an effort to avoid the confusion arising from the practice which before obtained of suing the United States under the names of the several owning companies, which names were used by the government in accounting and in operating their lines of transportation. These orders, in directing amendments to pending suits for causes arising since federal control, did not seek to substitute either a new liability or a new party, but merely gave the United States another and less misleading name.

The provisions of section 10 will not be held intended to apply to the owning companies, because so applied the legislation would be

not only unreasonable but probably unconstitutional. Taken to mean the government in its operation of the several railroads, it is intelligible, within the powers of Congress, accomplishes justice and the apparent intention of Congress, and accords with the executive construction of the Director General in the contracts made with the companies for their compensation, wherein he assumed all such liabilities, as well as in his orders of which 50 and 50a are examples.

Concordant conclusions have been reached by other District Courts on related questions. Rutherford v. Union Pacific R. R. Co. (D. C.) 254 Fed. 880; Mardis v. Hines, Director General (D. C.) 258 Fed. 945; Hatcher & Snyder v. A. & S. F. R. R. Co. (D. C.) 258 Fed. 952; Dahn v. McAdoo (D. C.) 256 Fed. 549; Haubert v. Baltimore Co. (D. C.) 259 Fed. 361; Nash v. Southern Pacific R. R. Co. (D. C.) 260 Fed. 280; Smith v. Babcock (D. C.) 260 Fed. 679.

While the changes thus made in the law affecting claims against the United States are great, they are, as stated, within the powers of Congress, and no reason appears why they should not be pursued to their legitimate consequences. Applied to the instant cases, this court has jurisdiction, because the suits arise under the laws of the United States and are controversies to which the United States are a party, and they are not excluded from its jurisdiction by the provisions of section 10 that no case should be removed for these reasons which was not removable prior to federal control.

The motion to remand will accordingly be denied.