Robinson, J.
 

 The defendant in error filed in the municipal court of Cincinnati its bill of particulars against plaintiff in error, James C. Davis, Agent, under Section 206 (a) of the Transportation Act of 1920 (41 Stat. at L. 461; Section 10169g [a], Barnes’ Fed. Code Supp., [U. iSl Comp. St. Ann. Supp., 1923, Section 10071%-ce]), alleging that its cause of action arose out of the possession, use, and operation by the President- of the common carrier, the Cincinnati, New Orleans & Texas Pacific Railway Company, and was of such character as prior to federal control could have been brought against the carrier.
 

 It alleged that on February 19', 1920, it delivered to the Director General, operating the Cincinnati, New Orleans & Texas Pacific Railway Company, certain goods-, consigned to the Bakers’ &, Confectioners’ Supply Company at New Orleans, for transportation over that railway and its connections to destination at New Orleans, and that a
 
 *501
 
 through bill of lading was issued by tbe Director General for the goods; that tbe railway company was at the time a common carrier for hire, operating from Cincinnati to New Orleans, on and over its lines and connecting carriers; that tbe Director General undertook to carry tbe goods, make delivery thereof according to tbe terms of the bill of lading, and to deliver to consignee at New Orleans within a reasonable time; that said carriers failed to transport and deliver tbe goods to consignee within a reasonable time, and failed to notify defendant in error of tbe location of tbe shipment until January, 1921; that, by reason of tbe negligence of tbe carrier and lapse of time, tbe goods became worthless and were totally lost to tbe defendant in error.
 

 Tbe plaintiff in error, in bis second amended statement of defense, admitted tbe partnership entity of tbe defendant in error, admitted tbe receipt from defendant in error by the Director General of Bailroads operating the Cincinnati, New Orleans & Texas Pacific Bailroad at Cincinnati of tbe goods described in tbe bill of particulars of defendant in error, for transportation to tbe Bakers’ & Confectioners’ Supply Company at New Orleans, admitted tbe issuance of a through bill of lading for such goods, and averred that it safely and promptly carried tbe goods to destination and on tbe 27th day of February, 1920, gave due notice to the consignee named in tbe bill of lading of tbe arrival of tbe goods. Plaintiff in error further averred that tbe goods were stored in tbe freight bouse of tbe New Orleans & Northeastern Bail-road Company on February 29, 1920, and were
 
 *502
 
 delivered over by the Director General of Railroads to the New Orleans & Northeastern Railroad Company a,t 12:01 o’clock a. m. March 1, 1920, and denied each and every allegation in defendant in error’s bill of particulars not specifically admitted.
 

 For a second defense, plaintiff in error averred that the bill of lading issued by the Director General of Railroads covering the shipment in question contained the following stipulation: “Claims must be made in writing to the originating or delivering carrier within six months after delivery of the property * * * or in case of failure to make delivery then within six months * * * after a reasonable time for delivery has elapsed, and that the defendant in error did not make claim in writing for loss or damage within six months after the lapse of a reasonable time for delivery thereof.
 

 The reply of defendant in error was a general denial of all allegations of the amended statement of defense except such as constituted admissions of the allegations of the bill of particulars.
 

 The ease proceeded to trial, and the evidence disclosed that the defendant in error, on the 19th day of February, 1920, delivered the goods in question to the Director General of Railroads operating the Cincinnati, New Orleans & Texas Pacific Railway Company, who received from defendant in error the freight charges for transportation over above road and its connecting lines to New Orleans, and issued to defendant in error a bill of lading; that the goods arrived in New Orleans on the 26th day of February, 1920, and on the 27th day of February, 1920, due notice was
 
 *503
 
 given to the consignee named in the bill of lading of the arrival of goods and the place of delivery thereof; that no attention was given to such notice by the consignee; that the goods were never delivered to or received by the consignee, but were stored on the 29th day of February, 1920, in the freight house of the New Orleans & Northeastern Railroad Company by the Director General of Railroads operating the New Orleans & Northeastern Railroad Company, and remained there without notice to the consignor until December '27,1920, when notice was given by the New Orleans & Northeastern Railroad Company to the consignor of its- failure to deliver the goods; that in the meantime the goods had spoiled and become of no value; and that the goods would have remained in marketable condition for a possible period of sixty days.
 

 The record does not disclose the terms of the transaction between the defendant in error and the consignee, the Bakers’ & Confectioners’ Supply Company, other than the fact that through a salesman the defendant in error had sold seven barrels of special cocoanut, detailed by the witness Oswald as follows:
 

 “Q.
 
 Now what was the transaction between you and the Bakers’ Confectionery Supply Company? A. A sale of seven barrels of cocoanut — • special cocoanut.
 

 “Q. How did you make that sale? A. A straightforward sale.
 

 “Q. I understand, but how was it carried through? Did you go there and make an agree
 
 *504
 
 ment with them or how? A. No, sir; it was sold through one of our representatives.
 

 “Q. Who was that? A. A man by the name of Hamburger.
 

 “Q. A traveling man for you? A. Yes, sir.
 

 “Q. He turned the order in to your office? A. Yes, sir.
 

 “Q. And you filled the order? A. Yes, sir.
 

 ££Q. Billing to the Bakers’ Confectionery Supply Company? A. Yes, sir.”
 

 The record is silent in regard to whether the delivery was on board oars at Cincinnati or at destination.
 

 At the close of defendant in error’s evidence, plaintiff in error made the following motion:
 

 ££The defendant rests, and moves for judgment, on the ground that the evidence shows no cause of action against Davis, Director General of Railroads, as agent of the Cincinnati, New Orleans & Texas Pacific Railway Company.”
 

 This motion was overruled by the court. Judgment was entered in favor of the defendant in error; error prosecuted to the court of common pleas, where the judgment of the municipal court was affirmed; error prosecuted to the Court of Appeals, where the judgment of the common pleas court was affirmed; and error is now prosecuted here.
 

 The record does not disclose in which court the claim was first made that the title to the goods in question passed out of the consignor, the defendant in error, to the consignee, upon delivery at Cincinnati to the Director General of Railroads. It is apparent, however, that the question was not
 
 *505
 
 ma.de in the trial court. It is, however, urged here that the record discloses an absolute transfer of title by the consignor to the consignee by such delivery.
 

 We do not so read the record. While it is true the witness Oswald testified that it was a “straightforward sale,” he also testified that it was an order taken by a salesman of the defendant in error and filled by the shipment. The record does not disclose the place of delivery; nor does it disclose whether the seven barrelg of special cocoanut ordered were seven specific barrels or just seven barrels of a certain grade of cocoanut, to be separated from a larger quantity. It does, however, disclose that the freight was paid to the plaintiff in error by the defendant in error.
 

 At common law, and as codified in iSection 8399, General Code, Rule 5, if the contract between the seller and buyer requires the seller to deliver the goods to the buyer at a particular place, the property does not pass until the goods have been delivered to the buyer, and, if the contract requires the seller to pay the freight to a particular place, the property does not pass until the goods have been delivered to that place — hence, if the place of delivery was New Orleans, the Director General of Railroads operating the Cincinnati, New Orleans & Texas Pacific Railway Company was the agent of the defendant in error to make such delivery; if he was the agent of the defendant in error to make the delivery, such agency would not terminate until the delivery was completed.
 

 The question of the right of the defendant in error to maintain the action not having been made
 
 *506
 
 in the trial court, the facts necessary to the determination of that question were not brought into the record, but this court at this stage of the proceeding is asked to presume, from the fact that one of the partners testified that it was a ‘ ‘ straightforward sale,” and from the fact that the partnership made demands upon the consignee for payment, that the title to the goods passed upon the delivery by the consignor to the Director General operating the Cincinnati, New Orleans & Texas Pacific Railway upon delivery of the goods to the Director General at Cincinnati, notwithstanding the fact that the consignor paid the freight to New Orleans.
 

 This the court will not do. The contract of the Director General having been with the consignor, and the freight charge having been received from it, the court will presume the ownership in it, unless the contrary is made to appear. We therefore do not find it necessary in this case to determine between the two lines of decisions touching the right of a consignor to maintain an action against the common carrier for loss of goods sold to a consignee.
 

 The fact that the plaintiff in error failed until the 27th day of December, 1920, to notify defendant in error that the goods had not been delivered to the consignee, in the absence of a showing that defendant in error knew or should have known that delivery had not been made, is sufficient to absolve defendant in error from its obligation under the terms of the bill of lading to make claim for damages within the time stipulated therein, for it became the duty of the delivering carrier, upon
 
 *507
 
 failure to make delivery to the consignee, to notify the consignor, and the receiving carrier became liable for the failure of the delivering carrier to discharge such duty.
 

 In the case of
 
 Stoddard Lumber Co.
 
 v.
 
 Oregon-Washington R. & N. Co.,
 
 84 Or., 399, 165 P., 363, 4 A. L. R., 1275, it was held:
 

 “(1) At common law, when it became impossible for a common carrier to deliver shipments in accordance with the contract of carriage, it was its duty to exercise ordinary care and diligence for the protection of the property of the owner.
 

 “(2) "Where a common carrier is unable to deliver the goods shipped to the consignee, it is its duty to exercise due diligence to notify the consignor within a reasonable time.”
 

 In the ease of
 
 Texarkana & F. S. R. Co.
 
 v.
 
 Twin City Products Co.
 
 (Tex. Civ. App.), 208 S. W., 989, it was held:
 

 “Where a consignee refuses to accept a shipment, duty to notify the shipper rests on the carrier as such, and so, where a connecting carrier, negligently delayed to notify a shipper of refusal to accept an interstate shipment, and it spoiled in the meantime, the initial carrier is liable.”
 

 The negligence of the delivering carrier became the negligence of the receiving carrier.
 

 'In the case of
 
 Galveston, Harrisburg & San Antonio By. Co.
 
 v.
 
 Wallace,
 
 223 U. S., 481, 491, 32 S. Ct., 205, 207 (56 L. Ed., 516), it was held:
 

 “Under the Carmack Amendment [U. S. Comp. St., Section 8604a], as already construed in the
 
 Riverside Mills case
 
 [219 U. S., 186, 31 S. Ct., 164,
 
 *508
 
 55 L. Ed., 167, 31 L. R. A., (N. S.), 7], wherever the carrier voluntarily accepts goods for shipment to a point on another line in another state, it is conclusively treated as having made a through contract. It thereby elected to treat the connecting carriers as its agents, for all purposes of transportation and delivery.”
 

 The receiving plaintiff in error cannot profit by its own or its agent’s negligence.
 

 The filing of the claim within six months after notice or knowledge was a sufficient compliance with the stipulation in the bill of lading.
 

 The plaintiff in error, however, relies upon his defense that the goods were in good condition when federal control terminated; that the goods decayed thereafter; and that the loss, if any, was occasioned by the negligence of the delivering carrier, occurring subsequent to government control; that, therefore, the right of action of the defendant in error, if any, is against one or the other, or both, of the carriers, but not against the Director General or the Agent of the federal government by reason of government operation of railroad transportation prior to the 1st day of March, 1920.
 

 The liability, however, of a common carrier to persons availing themselves of its common carrier service is a liability arising out of contract; the contract in this case being the bill of lading, plus federal legislation, the common law, and judicial decisions pertinent thereto.
 

 The Carmack Amendment, Interstate Commerce Act, Section 20 (Section 8604a, U. S. Comp. St.; Section 7976, Barnes’ Fed. Code), provides that:
 

 “Any common carrier, railroad, or transporta
 
 *509
 
 tion company subject to the provisions of this act receiving property for transportation from a point in one state * * * to a point in another state, * * * shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass * * * when transported on a through bill of lading, and no contract, receipt, rule, regulation, or other limitation of any character whatsoever, shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed.”
 

 In the case of
 
 Atlantic Coast Line R. Co.
 
 v.
 
 Riverside Mills,
 
 219 U. S., 186, 31 S. Ct., 164, 55 L. Ed., 167, 31 L. R. A., (N. S.), 7, it was held that Congress, by the act here involved, has declared, in substance, that the act of receiving property for transportation to a point in another state and beyond the line of the receiving carrier, shall impose on such receiving carrier, the obligation of through transportation with carrier’s liability throughout.
 

 The federal government, for the purposes of this action, became the receiving initial carrier of this shipment, and as a part of its contract assumed the obligation that it and its delivering carrier would discharge the obligation to exercise care in the carriage and delivery of the shipment. Seasonable care required that notice of a failure to deliver to consignee be given to consignor within a reasonable time. This obligation was not the obligation of the owners of the railroad property,
 
 *510
 
 but tbe obligation of the agency operating the railroad properties.
 

 In
 
 Missouri Pac. R.Co.
 
 v.
 
 Ault,
 
 256 U. S., 554, 560, 41 S. Ct., 593, 596, (65 L. Ed., 1087), it was held by tbe Supreme Court of tbe United States:
 

 “Tbe systems are regarded much as ships are regarded in admiralty. They are dealt with as active responsible parties answerable for their own wrongs. But since levy or execution upon their property was precluded as inconsistent with the government’s needs, the liability of the transportation system was to be enforced by allowing suit to be brought against whoever, as the party operating the same, was legally responsible under existing law, although it were the government. ’ ’
 

 At page 561 (41 S. Ct., 596) it was further held:
 

 “If the cause of action arose while the government was operating the system, the ‘carrier while under federal control’ was nevertheless to be liable and suable. This means, as a matter of law, that the government or its agency for operation could be sued, for under the existing law the legal person in control of the carrier was responsible for its acts.”
 

 To the same effect are
 
 Westbrook
 
 v.
 
 Director General of Railroads
 
 (D. C.), 263 F., 211;
 
 Hines, Dir. Geni.,
 
 v.
 
 Dahn
 
 (C. C. A.), 267 F., 105;
 
 McGill
 
 v.
 
 McAdoo, Dir. Gen. of Rds.,
 
 35 Idaho, 283, 206 P., 1057;
 
 Pettit
 
 v.
 
 Dir. Genl. of Rds.,
 
 110 Kan., 288, 203 P., 927;
 
 Haubert
 
 v.
 
 B. & O. Rd. Co.
 
 (D. C.), 259 F., 361.
 

 The Transportation Act of February 28, 1920, did not absolve the federal government from its contractual obligations. It provided, in Section 206
 
 *511
 
 (a), (41 Stat. at L., 461; Section 10169g [a], Barnes’ Fed. Code; U. S. Comp. St. Ann. Supp., 1923, Section 10071%cc), that:
 

 “Actions at law * * * based on causes of action arising out of the possession, use or operation by the President of the railroad or system of transportation of any carrier * * * of such character as prior to federal control could have been brought against such carrier, may, after the termination of federal control, be brought against an Agent designated by the President for such purpose.”
 

 In the case of
 
 Payne, Dir. Genl. of Rds.,
 
 v.
 
 Stockton,
 
 147 Ark., 598, 605, 229 S. W., 44, 46, the Supreme Court of Arkansas declared:
 

 “It is clear that the transportation Act of February 28, 1920, was not intended to destroy vested rights of action, or to authorize the President or his agents to do so. The sole purpose of the act, as shown by its terms, was to provide for the designation of an Agent by the President who might be served as an agent of the United States and defend suits which had arisen out of the operation of the railroads by the President. It did not purport to destroy any right of action which the claimants might have had before the Transportation Act was passed.”
 

 The liability of the federal government for the breach of a contract which it had undertaken to perform, which breach occurred after the termination of federal operation and control, is not different in principle from the liability of the receiving carrier for the breach of the contract by the delivering carrier, which breach occurs after the
 
 *512
 
 receiving carrier has made safe delivery to the delivering carrier; the liability in each instance being a contractual liability for a breach not its own occurring after its control has ended, which liability has been imposed by federal legislation.
 

 Judgment affirmed.
 

 Jones, Matthias, Dat, Allen and Kinkade, JJ., concur.