**CARVER et al. v. HAYNES et al.**

No. 1259.

District Court, S. D. California,
Central Division.

Feb. 26, 1941.

Nichols & Mattoon, of Los Angeles, Cal., for plaintiffs.

William Fleet Palmer, U. S. Atty., James L. Crawford, and John M. Gault, Asst. U. S. Attys., all of Los Angeles, Cal., for defendants.

O'CONNOR, District Judge.

This is a suit in tort to recover for personal injuries alleged to have been sustained on or about the 21st day of March, 1940, while plaintiffs were driving in their automobile on one of the public highways in the County of Los Angeles, State of California, when a motor vehicle belonging to and being operated by the defendants and being driven by the defendant, Robert Young Haynes, suddenly and without warning turned sharply to the left and toward the center of the highway and so ran into and upon and against the automobile being driven by the plaintiff, Grant Carver, and, because of such negligence, it is alleged that both plaintiffs were injured and their automobile was damaged. The complaint alleges that Robert Young Haynes was operating said truck as an employee of W. P. A. and acting within the scope of his employment under authority and supervision of defendants, Herbert C. Legg, as Administrator for W. P. A. of Southern California, Commissioner of Works Projects, and the Federal Works Administrator as agents of the W. P. A. The defendants moved to dismiss on the grounds:

(1) That the Court lacks jurisdiction over the subject matter because it is purely a tort action for negligence.

(2) That the Court lacks jurisdiction over the parties.

(3) That it is improper venue, there being no diversity of citizenship.

(4) That there is insufficiency of service of process.

(5) Because the complaint fails to state a claim against the defendants upon which relief can be granted.

This action is brought under Judicial Code, section 24, amended, Title 28, U.S.C.A. Judicial Code, section 41. The Emergency Relief Appropriation Act, 15 U.S.C.A. §§ 721–728, and the various amendments thereto are set forth in the complaint. Counsel for plaintiffs admits his inability to find any case wherein a tort action brought against the W. P. A. has been decided. The Court has not found such a case.

There are numerous actions, both in contract and in tort, brought against other instrumentalities and agencies of the Federal Government. We find a direct conflict in many of these decisions. In re Walker v. Home Owners' Loan Corporation, D.C., 25 F.Supp. 589, a tort action was instituted against the Home Owners Loan Corporation to recover for personal injury said to have been sustained in a fall from an unsafe chair in which plaintiff was invited to sit by an employee of the defendant while she was at defendant's office for business purposes. District Judge Neterer held defendant could not be sued in tort. A contrary decision was rendered in Re Pennell v. Home Owners' Loan Corporation, D.C., 21 F.Supp. 497. Plaintiff claimed to have been injured by the negligence of the defendant while upon its property. District Judge Peters held the defendant could be sued in tort.

The plaintiff, to sustain his right to sue the W. P. A. for negligence, cites the following: (1) Sloan Shipyards Corp. v. United States Shipping Board Emergency Fleet Corp. 1922, 258 U.S. 549, 42 S.Ct. 386, 66 L.Ed. 762; (2) Gould Coupler Co. v. United States Shipping Board Emergency Fleet Corp., D.C., 1919, 261 F. 716; (3) Federal Sugar Refining Co. v. United States Sugar Equalization Board, D.C., 1920, 268 F. 575; (4) Keifer & Keifer v. Reconstruction Finance Corp. and Regional Agricultural Credit Corp., 1939, 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784; (5) Casper v. Regional Agricultural Credit Corp., 1938, 202 Minn. 433, 278 N.W. 896; (6) Westbrook v. Director General of Railroads, D.C., 1920, 263 F. 211; (7) Salas v. United States, 2 Cir., 1916, 234 F. 842. A careful examination of these cases, in the opinion of this court, does not establish plaintiff's contention.

In re Sloan Shipyards Corp. v. United States Shipping Board Emergency Fleet Corp., supra, "The Shipping Act of September 7, 1916, c. 451; 39 Stat. 728 [46 U.S.C.A. § 801 et seq.] passed no doubt in contemplation of the possibility of war, to create a naval reserve and merchant marine, established the United States Shipping Board and gave it power to form a corporation under the laws of the District of Columbia for the purchase, construction and operation of merchant vessels * * *. The stock was not to exceed $50,000,000, and the Board was authorized to purchase not less than a majority of such stock. * * * The Shipping Act contemplated a corporation in which private persons might be stockholders and which was to be formed like any business corporation under the laws of the District, with capacity to sue and be sued." 258 U.S. at page 565, 42 S.Ct. at page 387, 66 L.Ed. 762. It is clear the corporation was organized to carry on a business in competition with similar businesses in the United States.

An interesting dissent from this majority opinion was written by Mr. Chief Justice Taft, concurred in by Mr. Justice Van Devanter and Mr. Justice Clarke. 258 U.S. at page 570, 42 S.Ct. at page 389, 66 L.Ed. 762.

In Gould Coupler Co. v. United States Shipping Board Emergency Fleet Corp., supra, the court said: "Section 11 of the Shipping Act (Comp.St. § 8146f [46 U.S.C.A. § 810]) provides that the corporation shall be chartered under the laws of the District of Columbia, and no one disputes that this means under its general corporation laws. The corporation was so formed under Code of Law D.C. c. 18, subchapter 4, which authorized actions by and against any corporation so organized. The Fleet Corporation was therefore meant to be a legal person without immunity quite as much as any other corporation." 261 F. at page 717.

The court also refers to the fact that this particular corporation was engaged in industrial and commercial ventures and said: "* * * the governmental agencies used should, whenever it can fairly be drawn from the statutes, be subject to the same liabilities and to the same tribunals as other persons or corporations similarly employed." 261 F. at page 718.

In Federal Sugar Refining Co. v. United States Sugar Equalization Board, supra, the court said: "The defenses rest principally upon the proposition that the defendant was an agent of the sovereign, and that an action against the agent is

in effect an action against the sovereign, and that the sovereign cannot be sued without its consent. * * * The agency here concerned is a Delaware corporation. Nothing in section 2, supra, purports to change (if there were power so to do) the rights, duties, obligations, and liabilities of such a corporation. The Congress did not enact any statute incorporating the defendant or specifically providing for its incorporation. Its incorporation was under the laws of Delaware, and the Revised Code of Delaware of 1915 (chapter 65, § 1916) provides:

" 'Sec. 2. Powers.—Every corporation created under the provisions of the chapter shall have power. * * * 2. To sue and be sued, complain and defend in any court of law or equity. * * * 8. To conduct business in this state, other states, the District of Columbia, the territories and colonies of the United States and in foreign countries. * * *'

"If the sovereign thus chooses as its agent a state corporation which can be sued it cannot by ipse dixit deprive one injured by such an agent of the right to sue. The state of Delaware allowed defendant to be created, but as a condition of its creation and existence it afforded the right to any one to sue the corporate being which it thus created. It is alleged that, upon 'the direction' of the President, defendant was incorporated. This is but another way of saying that the President directed that the necessary number of persons required under the Delaware statute should take the steps necessary under that statute to incorporate a defendant subject to the liabilities of that statute. Neither the Executive nor any person acting with authority under him had the power to change the Delaware statute, and hence no power to change the obligations, rights, or liabilities of a corporation which was the creature of the statute; i. e., the creature of the sovereign state of Delaware." 268 F. at page 584.

In Westbrook v. Director General of Railroads, supra, the railroads placed by law under the supervision of the United States were subject to the laws and to the same statutes as they had been formerly, except as modified by Congressional act. The court said: "The denial of the right to levy was a sufficient protection, if not the limit of Congressional authority as to suits against these corporations on their liabilities. But as applied to the governmental operation of the transportation systems every provision becomes a code. The first sentence, declaring that the carriers, while under federal control, shall be subject to all laws and liabilities as common carriers, state, federal, or at common law, created a liability on the part of the United States for every act and omission for which liability had formerly attached to the owners in their business as common carriers. The reserved right to alter these by orders of the President was a power to quickly withdraw this liability to any extent found to be needful. Thus Congress made the railroads' liabilities to patrons, employes, and the public arising under federal control to be 'claims against the United States.' " 263 F. at page 216.

In Casper v. Regional Agricultural Credit Corp., supra, the defendant was a creature of the Reconstruction Finance Corporation pursuant to section 605b (e) of the act under which the Reconstruction Finance Corporation was organized. 15 U.S.C.A. §§ 601–617. Under the authority granted to the Reconstruction Finance Corporation it created a defendant. The court said: "The inference that defendant is subject to suit is supported by the fact that its creator, the Reconstruction Finance Corporation, is itself subject to suit. The theory on which immunity is sustained is that the creator has transmitted to the creature its sovereign immunity. The government withheld such immunity from the Reconstruction Finance Corporation. It thus indicated a general policy of subjecting the Reconstruction Finance Corporation and its property to suit and judicial process. True, defendant derives its powers from the statute, but it is hardly to be inferred that immunity would be granted to the creature where it is withheld from the creator. The fact that defendant was created a corporation with all incidents of a corporation would seem to be decisive in the light of other considerations." 278 N.W. page 901.

It is interesting to note that Justice Peterson declined to follow the decision in Keifer & Keifer v. Reconstruction Finance Corp., D.C., 22 F.Supp. 918, on the grounds stated above; and he was sustained by the Supreme Court in Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784.

In re Salas v. United States, supra, was a criminal action, the court discussed the status of the Panama Railroad Company,

and said: "The government, however, continued the original corporate organization of the railroad company for its own purposes, among others to avoid the restrictions of certain laws of the United States applicable to the Commission. * * * When the United States enters into commercial business it abandons its sovereign capacity and is to be treated like any other corporation. Bank of United States v. Planters' Bank, 9 Wheat. 904, 6 L.Ed. 244. Although it absolutely owns the Panama Railroad Company and is the only person profiting or losing by its activities, still the railroad company sues and is sued just like any other corporation, in its own name. If this tobacco had been deficient in quality, the railroad company could have sued Salas to recover the damages, and if it had not been paid for Salas could have sued the railroad company for the price." 234 F. at page 844.

In Keifer & Keifer v. Reconstruction Finance Corp., 1939, supra, it was stated in the opinion that the Reconstruction Finance Corporation was authorized to create regional agricultural credit corporations. The defendant was one of the regionals so created. "Regional, in due exercise of its powers, entered into so-called cattle-feeding contracts, whereby it undertook to provide sufficient feed and water for livestock with appropriate security for rendering these services. Failure through negligence to provide proper care for cattle delivered under this arrangement, with resulting damage to the livestock, is the basis of this suit brought by petitioner, plaintiff below, against Reconstruction and Regional." [306 U.S. 381, 59 S.Ct. 517, 83 L.Ed. 784.]

The court discussed whether the government had clothed Regional with immunity, and held that "Congress had a right to assume that the characteristic energies for corporate enterprise with which a few months previously it had endowed Reconstruction would now radiate through Reconstruction to Regional." 306 U.S. at page 394, 59 S.Ct. at page 520, 83 L.Ed. 784. The statute creating the Reconstruction Finance Corporation provided, among other powers, authority "to sue and be sued, to complain and to defend, in any court of competent jurisdiction, State or Federal." 47 Stat. 5, 6, 15 U.S.C.A. § 604. The court held that to sustain the contention of the defendant, it would have been necessary for Congress to qualify the general power to sue and be sued. "In the light of these statutes it ought not to be assumed that when Congress consented 'to suit' without qualification, the effect is the same as though it had written 'in suits on contract, express or implied, in cases not sounding in tort.' No such distinction was made by Congress, and no such interpolation into statutes has been made in cases affecting government corporations incorporated under state law or that of the District of Columbia." 306 U.S. at page 396, 59 S.Ct. at page 521, 83 L.Ed. 784.

The Keifer case has been reaffirmed during the present month by the Supreme Court in Reconstruction Finance Corporation, Petitioner, v. J. G. Menihan Corp., J. G. Menihan, Sr., and J. G. Menihan, Jr., February 3, 1941, 61 S.Ct. 485, 486, 85 L. Ed. ——. Mr. Chief Justice Hughes, speaking for the Court, said:

"The Reconstruction Finance Corporation is a corporate agency of the government, which is its sole stockholder. 47 Stat. 5, 15 U.S.C. [§] 601 et seq., 15 U.S.C.A. § 601 et seq. It is managed by a board of directors appointed by the President by and with the advice and consent of the Senate. The Corporation has wide powers and conducts financial operations on a vast scale. While it acts as a governmental agency in performing its functions (see Pittman v. Home Owners' Loan Corporation, 308 U.S. 21, 32, 33, 60 S.Ct. 15, 17, 18, 84 L.Ed. 11, 124 A.L.R. 1263), still its transactions are akin to those of private enterprises and the mere fact that it is an agency of the government does not extend to it the immunity of the sovereign. Sloan Shipyards [Corp.] v. United States [Shipping Board Emergency] Fleet Corporation, 258 U.S. 549, 566, 567, 42 S.Ct. 386, 388, 66 L. Ed. 762. Congress has expressly provided that the Reconstruction Finance Corporation shall have power 'to sue and be sued, to complain and to defend, in any court of competent jurisdiction, State or Federal'. * * * We have had recent occasion to consider the status, in relation to suits, of a regional corporation chartered by the Reconstruction Finance Corporation and we have set forth the general principles which we think should govern in our approach to the particular question now presented. Keifer & Keifer v. Reconstruction Finance Corporation, 306 U.S. 381, 59 S.Ct. 516, 517, 83 L.Ed. 784. In the Keifer case we did not find it necessary to trace to its origin the doctrine of the exceptional freedom of the United States from legal responsibility, but we observed that 'because the doctrine gives the government a privileged position,

it has been appropriately confined'. Hence, we declared that 'the government does not become the conduit of its immunity in suits against its agents or instrumentalities merely because they do its work'. Id., 306 U.S. page 388, 59 S.Ct. page 517, 83 L.Ed. 784. Recognizing that Congress may endow a governmental corporation with the government's immunity, we found the question to be 'Has it done so?' * * *

"Starting from the premise indicated in the Keifer case that waivers by Congress of governmental immunity from suit should be liberally construed in the case of federal instrumentalities—that being in line with the current disfavor of the doctrine of governmental immunity—we concluded that in the absence of a contrary showing 'it must be presumed that when Congress launched a governmental agency into the commercial world and endowed it with authority to "sue and be sued", that agency is not less amenable to judicial process than a private enterprise under like circumstances would be'. Following that reasoning, the precise point of the decision was that the words 'sue and be sued' normally embrace all civil process incident to the commencement or continuance of legal proceedings and hence embraced garnishment as part of that process."

The court reached the same conclusion in Federal Housing Administration v. Burr, 309 U.S. 242, 60 S.Ct. 488, 84 L.Ed. 724.

The distinction between governmental and proprietary capacity is well expressed in Chafor v. City of Long Beach, 174 Cal. 478, 163 P. 670, L.R.A.1917E, 685, Ann. Cas.1918D, 106.

The defendants rely upon a number of cases which they contend support their claims. In re Schillinger v. United States, 155 U.S. 163, 15 S.Ct. 85, 39 L.Ed. 108, the plaintiff contended that a government contractor had, without permission, used plaintiff's patent device and the benefits inured to the United States.

In Russell v. United States, 182 U.S. 516, 21 S.Ct. 899, 45 L.Ed. 1210, the court held the Court of Claims had no jurisdiction in demands against the United States founded on tort.

Bigby v. United States, 188 U.S. 400, 23 S.Ct. 468, 47 L.Ed. 519, was a tort action against the United States for personal injuries alleged to have been received by plaintiff while entering an elevator placed by the United States in its Court House and Post Office Building in the City of Brook-

lyn. The court held a tort action could not be maintained against the United States.

In Peabody v. United States, 231 U.S. 530, 34 S.Ct. 159, 58 L.Ed. 351, the court held that the government had not consented to be sued for torts even though committed by its officers in the discharge of their official duties.

In Danforth v. United States, 8 Cir., 102 F.2d 5, at page 8, the court said: "It is the settled rule that a sovereign state cannot be sued without its consent, and this is true whether the issue is raised by direct suit or otherwise. Nassau Smelting & Refining Works v. United States, 266 U.S. 101, 107, 45 S.Ct. 25, 69 L.Ed. 190; Illinois Central R. Co. v. Public Utilities Comm., 245 U.S. 493, 38 S.Ct. 170, 62 L. Ed. 425; Davis v. O'Hara, 266 U.S. 314, 45 S.Ct. 104, 69 L.Ed. 303; Bigby v. United States, 188 U.S. 400, 401, 23 S.Ct. 468, 47 L.Ed 519; North Dakota-Montana W. G. Ass'n v. United States, 8 Cir., 66 F.2d 573, 92 A.L.R. 1484."

In re Transcontinental & Western Air, Inc., v. Farley, 2 Cir., 71 F.2d 288, the court held the United States could not be made a party to a suit without its consent; further, that the operation and control of the mails is a government function. "By virtue of article 1, § 8, of the Constitution of the United States, Congress has been given power to make all laws which shall be necessary and proper for carrying into execution the powers resting in the national government to establish post offices and post roads and to control and operate the carrying of the mails. McCulloch v. Maryland, 4 Wheat. 316, 417, 4 L.Ed. 579. * * In re Debs, 158 U.S. 564, 15 S.Ct. 900, 39 L.Ed. 1092." 71 F.2d at page 290. It will be noted that in all of the decisions in which the courts have held an agency or instrumentality of the government as liable, the agency or instrumentality of the United States government was carrying on a commercial business or enterprise, and also in each instance Congress had provided that the agency or instrumentality or corporation could sue or be sued.

In the one instance, in Keifer & Keifer v. Reconstruction Finance Corp. and Regional Agricultural Credit Corp., supra, the particular corporation's charter did not contain the provision to sue or be sued, but the Supreme Court held that as the Reconstruction Finance Corporation, whose charter provided that it could sue and be sued, had created the Regional Agricultural

Credit Corporation, that power was transmitted to the Regional. It will be noted that the cases relied upon by the defendants are, in each instance, actions against the United States, and it is well established that the United States cannot be sued for a tort without its consent. In the present case, the plaintiff attempts to impose liability upon the Work Projects Administration and the Federal Works Administration for a tort. Under the provisions of the "Emergency Relief Appropriation Act of 1935" approved April 8, 1935, Public Resolution No. 11, 74th Congress, 15 U.S. C.A. §§ 721–728 note, the President of the United States of America on May 6, 1935, established the Works Progress Administration by Executive Order No. 7034; an Administrator in charge of the Works Progress Administration was appointed by and made responsible to the President of the United States of America; administrative units of the Works Progress Administration were created in each of the states, including California; work projects were carried on under the general supervision of local administrators and the Administrator in charge of all units; under the provisions of the "Reorganization Act of 1939," approved April 3, 1939, Public No. 19, 76th Congress, 1st session, 5 U.S.C.A. § 133 et seq., and Reorganization Plan No. 1 submitted to Congress by the President of the United States of America on April 25, 1939, approved June 7, 1939, C. 193, Sec. 1, 53 Stat. 813, 5 U.S.C.A. § 133s, the Works Progress Administration was placed under the Federal Works Agency and its name changed to the Work Projects Administration, and its functions were thenceforth and since carried out by and administered as the Work Projects Administration with a Commissioner of Work Projects at the head thereof acting under the direction and supervision of the Federal Works Administrator, and pursuant to the "Emergency Relief Appropriation Act of 1939" passed by resolution June 30, 1939, C. 252, 53 Stat. 927, 15 U.S.C.A. §§ 721–728, the functions theretofore vested in the Works Progress Administration were and are authorized thenceforth to be carried out by the Work Projects Administration.

Resolution No. 11, passed by the 74th Congress and approved April 8, 1935, and cited as "Emergency Relief Appropriation Act of 1935", 49 Stat. 115, ch. 48 opens with the sentence "That in order to provide relief, work relief and to increase employment by providing for useful projects, there is hereby appropriated, out of any money in the Treasury not otherwise appropriated, to be used in the discretion and under the direction of the President, to be immediately available and to remain available until June 30, 1937, the sum of $4,000,000,000 * * *." Former appropriations are referred to for national industrial recovery, 48 Stat. 274, emergency relief and civil works, 48 Stat. 351, 48 Stat. 1055, and 48 Stat. 22, 16 U.S.C.A. § 585 et seq. The expenditure of the funds is left largely to the discretion of the President of the United States with certain directions.

Pursuant to the authority given by Congress under Resolution 11, supra, to the President, an Executive Order, No. 7034, was issued May 6, 1935, which provided:

"I hereby establish within the Government certain agencies and prescribe their respective functions and duties as follows:

"(C) A Works Progress Administration, which shall be responsible to the President for the honest, efficient, speedy, and coordinated execution of the work relief program as a whole, and for the execution of that program in such manner as to move from the relief rolls to work on such projects or in private employment the maximum number of persons in the shortest time possible."

Among the powers and duties vested in the W.P.A. were: (a) To assure that as many of the persons employed on all work projects as is feasible shall be persons receiving relief; and (b) to govern the selection of such persons for such employment.

The Order provides also that: "The Federal Emergency Relief Administrator shall serve also as Administrator of the Works Progress Administration." The concluding sentence of the President's Order is: "Provided, That so far as practicable the persons employed under the authority of this section shall be selected from those receiving relief."

Executive Order No. 7046, dated May 20, 1935, prescribing wages, hours of work, etc., provides: "(c) Preference in the employment of workers shall be given to persons from the public relief rolls, and except with the specific authorization of the Works Progress Administration at least 90 per cent of all persons working

on a work project shall have been taken from the public relief rolls."

49 Stat. 1608, ch. 689, approved June 22, 1936, provided: "This title may be cited as the Emergency Relief Appropriation Act of 1936. To continue to provide relief, and work relief on useful projects, in the United States and its Territories and possessions (including projects heretofore approved for the Works Progress Administration which projects shall not be subject to the limitations hereinafter specified in this paragraph), $1,425,-000,000, to be used in the discretion and under the direction of the President * * *", and after eliminating aliens illegally within the United States from employment rolls, provides: "and they shall make every reasonable effort consistent with prompt employment of the destitute unemployed to see that such aliens are not employed, and if employed and their status as such alien is disclosed they shall thereupon be discharged."

In the extensions given under the Emergency Relief Appropriation Acts of June 29, 1937, 50 Stat. 352, ch. 401, June 21, 1938, 52 Stat. 809, ch. 554, Feb. 4, 1939, 53 Stat. 507, June 30, 1939, 53 Stat. 927, and June 26, 1940, 54 Stat. 611, 15 U.S.C.A. §§ 721–728, (Works Progress Administration and the Works Projects Administration are authorized to be carried out until June 30, 1941 by the Works Projects Administration), the intention of Congress was clearly "to provide work for needy persons on useful public projects * * *."

The Act of June 30, 1939, 15 U.S.C.A. §§ 721–728, note, was in force when the accident occurred, to-wit: March 21, 1940. It provided: "Sec. 26. The Commissioner and the National Youth Administrator are authorized to consider, ascertain, adjust, determine, and pay from the appropriation in section 1 or section 2 hereof any claim arising out of operations thereunder accruing after the effective date of this joint resolution on account of damage to or loss of privately owned property caused by the negligence of any employee of the Work Projects Administration or the National Youth Administration, as the case may be, while acting within the scope of his employment. No claim shall be considered hereunder which is in excess of $500, or which is not presented in writing within one year from the date of accrual thereof. Acceptance by a claimant of the amount allowed on account of his claim shall be deemed to be in full settlement thereof, and the action upon such claim so accepted by the claimant shall be conclusive."

There is no provision in any of the acts of Congress or in the Executive Orders of the President of the United States made pursuant to such Congressional authority, authorizing the defendants, Legg as Administrator for Work Projects Administration of Southern California, Commissioner of Work Projects, Washington, D. C., or Federal Works Administrator, to sue or be sued. Again the objects and purposes of the defendant government agencies are not commercial and are not in competition with citizens of the United States or any other persons or corporations. They are not organized for profit. They are engaged in relief. They are functioning as far from a commercial enterprise as it is possible to conceive and as nearly acting for the government in a governmental capacity as any agency can act. They are appointed by the President, act under rules prescribed by him at his direction. While there is no common law liability against the government for a tort, such immunity may be waived. In the act under discussion, Congress has limited the liability to privately owned property to $500 and provides the procedure. Congress intended clearly to limit the liability of the defendant government agencies.

The appropriations to carry on the work of the defendant government agencies is authorized under section 8, article 1 of the Constitution of the United States. While there is some dissent from this view, it seems difficult to so construe the general welfare clause to exclude relief to millions of our people who through no fault of their own have found themselves, because of a general breakdown in economic conditions, to be without employment and without food. Rok v. Legg, D.C., 27 F.Supp. 243.

In granting the motion of defendants Herbert C. Legg as Administrator for Work Projects Administration of Southern California, Commissioner of Work Projects, Washington, D. C., and Federal Works Administrator, only the defendant Robert Young Haynes remains, and as he and the plaintiffs are residents of the state of California, the action is dismissed as against defendant Haynes. Wylie v. State Board of Equalization, D. C.,

21 F.Supp. 604; Dollar S. S. Lines v. Merz, 9 Cir., 68 F.2d 594; Goldstein v. Sommervell, 170 Misc. 602, 10 N.Y.S.2d 747; Nagle v. Wyoga Gas & Oil Corp., D.C., 10 F.Supp. 905.

The motion of the defendants for dismissal is granted.